Argued December 4, 1978, modified and remanded to the
tax court for entry of a decree in accordance with this opinion June 12,
petition for rehearing denied July 5, 1979

# PACIFIC POWER & LIGHT COMPANY,
*Respondent,*

*v.*

# DEPARTMENT OF REVENUE,
*Appellant.*

(TC 987, TC 1095, SC 25559, SC 25560)

596 P2d 912

[530]

[530-a]

Alfred B. Thomas, Assistant Attorney General, Salem, argued the cause and filed the briefs for appellant. With him on the briefs was James A. Redden, Attorney General, Salem.

Gerald K. Drummond, Portland, argued the cause and filed the brief for respondent. With him on the brief were Rives, Bonyhadi & Smith, George D. Rives, Dahl, Zalutsky, Nichols & Hinson, P.C., and John B. Descamp, Jr., Portland.

Before Denecke, Chief Justice, and Bryson,* Howell, Linde, Lent and Tongue, Justices.

LENT, J.

---

* Bryson, J. retired April 1, 1979, and did not participate in this opinion.

**LENT, J.**

Defendant appeals from a decree of the Oregon Tax Court.[1]

Plaintiff Pacific Power and Light Company is a Maine corporation qualified to do business in Oregon, California, Washington, Montana, Idaho, and Wyoming. Its principal place of business is in Portland, Oregon. The corporation provides electric, water and steam heat service to customers within the State of Oregon and elsewhere and is regulated here as a public utility. Its utility property in Oregon is subject to ad valorem taxation and annual evaluation and assessment by the Department of Revenue pursuant to ORS 308.515.

Defendant originally assessed plaintiff's electric service properties as of the assessment date, January 1, 1975, to be $446,670,000 and January 1, 1976, to be $454,614,000. Plaintiff filed petitions with defendant for correction, pursuant to ORS 308.595(2), but the petitions were denied. Plaintiff then appealed to the tax court pursuant to ORS 308.620.

On plaintiff's motion at the tax court proceeding, the two suits relating to those tax years were consolidated for trial because they involved common questions of law and fact. The suit relating to the January 1, 1975 assessment date was tried with the recognition of court and counsel that determinations on that suit were also applicable to the suit on the January 1, 1976 assessment date.

After plaintiff had presented its case to the tax court against the original assessments, defendant responded with new appraisals for the two years which involved substantial changes in appraisal approach. Defendant asserted values of $560,067,000 for January 1, 1975 and $558,964,500 for January 1, 1976. Then in oral argument on behalf of its motion to

_____

[1] 7 OTR 203 (1977).

present the new appraisals, defendant proposed a further amendment to $570,472,000 and $569,259,000 for the two years. The tax court approved defendant's motion to file these amended answers based upon its interpretation of ORS 305.425(3) and ORS 308.515 to 308.635, particularly ORS 308.620 and 308.630(2). 7 OTR at 211-212. This decision is not disputed by the parties before this court.

At the conclusion of the proceeding the tax court decided in favor of plaintiff, reversing two orders of the Department of Revenue, Nos. A&AU-75-65 and A&AU-76-39, and finding values of plaintiff's electric service properties of $308,473,727 for January 1, 1975 and $334,932,136 for January 1, 1976. Defendant appeals and we modify as permitted by ORS 305.445.

### 1. *Valuation Technique.*

The basis for defendant's change in assessment values from that asserted in its opinions and orders to that argued before the tax court was a change in valuation methods utilized by defendant. In the original appraisal defendant used a composite weighted average of three indicators of value, the cost of plant weighted at 60 percent, the capitalized income weighted at 30 percent, and the market value of the company's outstanding stock and debt, or value of its outstanding issues of stock, bonds and short-term debt as of the assessment date, weighted at 10 percent. In its new approach presented to the tax court defendant chose to rely solely upon the capitalized income approach to fixing value. Plaintiff argues that all three indicators of value should be used here.

■ ORS 308.205 provides that "true cash value" means the market value of the property as of the assessment date. The Department of Revenue's rule OAR 150-308.205-(A) 2 provides:

"Methods and Procedures for Determining True Cash Value: Real property shall be valued through the market data approach, cost approach and income approach. Any one of the three approaches to value,

[532]

or all of them, or a combination of approaches, may finally be used by the appraiser in making an estimate of market value, depending upon the circumstances."[2]

While, under the statute and rule, it is allowable for defendant to use only one approach in valuing property, whether in any given assessment one approach should be used exclusive of the others or is preferable to another or to a combination of approaches is a question of fact to be determined by the court upon the record.

The income approach is now viewed as the most reliable indicator of value by both parties. They disagree, however, as to whether it should be the sole indicator of value and as to how income is thereby actually to be computed.

As for the cost approach, defendant argues that it should not be used here because it sets the floor of value and thus finds less than the true cash value of the property. In virtually sole support of this argument defendant points to its attempted impeachment in the tax court of witness Ring, one of plaintiff's review appraisers,[3] by a portion of an article written by him in the National Tax Journal, Vol. XXV, No. 2, June 1972, at 236. On cross-examination Dr. Ring read from the article and testified:

" 'In a regulated utility where income is limited to a stipulated rate of return as applied to a rate base reflecting original cost, better known as aboriginal cost in industry literature, less accrued depreciation, the order of evidence of value are [sic] reversed as original cost less accrued depreciation from all causes sets the floor of value and income adjusted to reflect hopefully a market rate of earnings sets the upper level of value.' I would subscribe to that. When I said

---

[2] No mention is made of the "stock and debt" approach, but defendant does not contend that the rule outlaws that approach. This is probably because this approach is equivalent to the "market data approach."

[3] Plaintiff's appraisers did not do their own appraisals of the property, but rather reviewed the appraisal done by the Department and made amendments to it to reach their own determinations of value.

[in the witness' earlier testimony] cost is the upper limits of value this is the traditional concept as expressed in my text which is written for unregulated companies."

However, later in the tax court proceeding Dr. Ring described the background of the article and testified that cost sets the ceiling of value for regulated utilities:

"Well, that—at that particular time the market was extremely high when regulated—regulated—regulated bodies and Department of Revenues were using a high percentage rate applicable to stock and debt. At that time, too, in this particular company that I represented, the income generated was in excess of that allowed by the regulatory authority and a refund to customers was ordered, millions of dollars. So in that instance, the income generated was in excess of what the Public Utility Commission allowed. Therefore, income exceeded cost and the market exceeded cost and therefore I made that statement that under those circumstances the cost of—original cost would set the floor, but those were circumstances which are not present today. The market is not what it was then and neither—he would deal with the utility that earns in excess. It doesn't even reach the rate of capitalization."

Though defendant did assert that Dr. Ring's testimony is contradictory, defendant did not rebut the reasoning of Dr. Ring's explanation. Mr. Goodman, another review appraiser for plaintiff, also testified that cost sets the ceiling of value:

"Q Now, would you say that—that there is a ceiling that we can look to for the true cash value of a regulated company, public utility?

"A Yes, I think this is where any appraiser would start as he moves into an appraisal. He would look at the nature of the operation to determine if he can get any broad bench marks to start with and in looking at a utility from the point of view of appraising its true cash value, he would, I think, immediately come to the conclusion that the cost approach to value would set the upper limit of the value and the

[534]

reason that this would be is because of the effects of regulation. For instance, the income that can be generated from the property is a function, in effect, of the cost approach. Basically the original cost depreciated, or the rate base, with some minor adjustments in there. This then fixes an amount of income. If the rate of return that is authorized by the regulatory body is less than that required by a prudent investor, as it almost always is, the cost indicator then, obviously, has to set the upper limit of value. * * *"

■ Plaintiff asserts that the cost approach sets the ceiling of value because the original cost of plaintiff's utility assets, less accrued depreciation, serves as the base upon which the company's earnings are determined, and that because the evidence shows the company's allowed rate of earnings is less than the market rate of the cost of capital, the true cash value is less than historical cost. It is also noteworthy that in defendant's original appraisal and in plaintiff's review appraisals the cost indicator of value is higher than the other indicators of value. Absent effective rebuttal of plaintiff's position, we accept that cost sets the ceiling of value in this case.

Beyond the floor/ceiling argument, there is testimony in the record of defendant's witnesses supporting use of the cost approach. At the beginning of the tax court proceeding, when they were being questioned about their original appraisal and before they had introduced the new appraisal using only the income method, defendant's witnesses asserted that the cost approach was more accurate than the income and stock and debt approaches. Mr. Bredehoeft, defendant's supervisor of the utility section of the valuation division, testified that the failure of Consolidated Edison Company of New York to pay its dividend in 1974 had "a very depressing effect on the price of stock" and "an elevating effect on the 'cap' rate or apparent cost of equity money" during the two years at issue here. Because of its lowered confidence in the income and stock and debt indicators, defendant gave

[535]

less weight to them than to cost. Mr. Arrowsmith, defendant's appraiser in this case, testified that

> "an investor would consider the historical cost depreciated of the plant in view of the fact that this provides a measure for what would be allowed to earn in historical cost rate jurisdiction."

He also testified that cost was a good indicator of value for plaintiff because it had "a very high percentage of very recent dollars invested in plant." Later, though, he testified that cost was not a good indicator of value here because

> "cost may approach value quite closely and that is at the time of original acquisition of the property but the farther away we get from that the less certain it is as an indicator of value, particularly historical cost."

Similar contradictory testimony of defendant's witnesses exists in the record with regard to whether the stock and debt approach should be utilized. At one point Mr. Arrowsmith testified in favor of using that approach and then qualified the statement to make sure it would not apply to defendant's new appraisal:

> "I believe this indicator bears some consideration in that it reflects a measure of the stock and bond investor's estimate of the company's value. However, I believe it is far less reliable than either the cost or income indicators. I would like to state at this moment, Your Honor, that this statement was made based in description of the actual appraisal and the description does not apply to my current appraisal but was made in the actual appraisal for the 1975 assessment. Not my current appraisal."

The efficacy of an argument, however, does not diminish because one no longer wishes to use it. The statements of defendant's witnesses in support of using the cost and stock and debt indicators of value were strong and we find no effective explanation to discredit that approach. Actually, it was plaintiff who offered the most criticism of the cost and stock and debt approaches through the testimony of its witnesses early in the trial. For example, Dr. Ring testified that

[536]

he would "give no weight to the stock and debt" and suggested income be weighted at 60 percent and cost at 40 percent. He also stated, though, that he had "no quarrel with a ten percent weight" for stock and debt.

The tax court determined that all three indicators of value should be used in this appraisal and used a weighting of 60 percent for the income method, 30 percent for the cost method, and 10 percent for the stock and debt method. The court's computations are not included in its opinion but were part of its "Findings of Fact, Conclusions of Law and Decree." Our summarization of the tax court's computations follows:

*For January 1, 1975:*

| | | | |
|---|---|---|---|
| Income | $ 670,457,220 | ×60% | $ 402,274,332 |

(The court used the company's actual income for 1975 of $88,031,033 and divided it by a capitalization rate of 13.13%)

| | | | |
|---|---|---|---|
| Cost | $1,373,975,452 | ×30% | $ 412,192,636 |
| Stock and Debt | $1,134,707,212 | ×10% | $ 113,470,721 |
| | | | $ 927,937,689 |
| Oregon Allocation Factor[4] | | | .3369 |
| | | | $ 312,622,207 |
| Add Leased Property | | | 162,400 |
| Deduct Motor Vehicles and Locally Assessed | | | |
| Plant Held for Future Use | | | ($ 4,310,880) |
| | | | $ 308,473,727 |

*For January 1, 1976:*

| | | | |
|---|---|---|---|
| Income | $ 835,512,750 | ×60% | $ 501,307,650 |

(Actual income for 1976 of $102,684,517 divided by capitalization rate of 12.29%)

| | | | |
|---|---|---|---|
| Cost | $1,591,678,027 | ×30% | $ 477,503,408 |
| Stock and Debt | $1,319,775,994 | ×10% | $ 131,977,599 |
| | | | $1,110,788,657 |
| Oregon Allocation Factor | | | .3047 |
| | | | $ 338,457,304 |
| Add Leased Property | | | 162,400 |
| Deduct Motor Vehicles and Locally Assessed | | | |
| Plant Held for Future Use | | | ($ 3,687,568) |
| | | | $ 334,932,136 |

---

[4] The Department of Revenue assesses plaintiff's electric service property on a unit basis and then with the use of an allocation factor assesses Oregon's share of the property. The formula allocating a part of the total property to Oregon is not at issue.

■ Plaintiff asserts that this court should give substantial weight to the tax court's findings and conclusions. However, as we have expressed in *Medical Building Land Co. v. Dept. of Rev.,* 283 Or 69, 74 n.3, 582 P2d 416 (1978) and *Bend Millwork v. Dept. of Rev.,* 285 Or 577, 603, 592 P2d 986 (1979), only in certain circumstances do we grant such deference. Our review is de novo, as provided by ORS 19.125(3), and we have accordingly studied the transcript and exhibits to come to our own conclusions.

■ We find that the limitations of the three approaches pointed out by the parties should go to determining the weight to be given the individual approaches rather than to completely eliminating two of the approaches from consideration. Defendant's shift in appraisal methodology to the income indicator of value alone was accomplished without sufficient explanation why the cost and stock and debt indicators should be ignored. Not only is there data available for all three approaches, but they also serve as a check and balance upon one another. The weightings of 60 percent to income, 30 percent to cost and 10 percent to stock and debt will be used here.

The remainder of the issues about which the parties disagree concern the income indicator of value. This capitalized income approach to value was described by Mr. Goodman to be "the process of obtaining the present value of the future income to be derived from a property." Involved in the procedure is a determination of the appropriate income to be capitalized and of the appropriate rate of capitalization to be applied to the income. For clarity and ease of comparison with the tax court opinion, we will use the number and subject headings used by the tax court, such as heading #1 above, "Valuation Technique," though in somewhat of a different order.

First, heading #10, "Income to be Capitalized," is addressed to set out the time period represented by such income and to give somewhat of an overview of

what such income is to represent. Then the method of determining or projecting the income to be capitalized is addressed under heading #4, "Performance Ratio Used to Project Income." Separate elements of income, including heading #5, "Construction Work in Progress," heading #7, "Rate Increases," and heading #9, "Defendant's Treatment of Deferred Taxes" are discussed next. Related to heading #9 is heading #3, "Depreciation—Flow-Through Accounting," which concerns defendant's treatment of deferred taxes and investment tax credits. Then factors related to capitalization, including heading #2, "Annuity Method of Capitalization—Treatment of Depreciation" and heading #11, "Rate of Capitalization" are the final subjects to be addressed.[5]

Before addressing these issues we believe it is helpful to briefly set out the parties' income approaches. Plaintiff sought a projection of income for the assessment year and asserted the best means of obtaining that value is the "least squares" method. Dr. Ring defined the least squares method as

> "a statistical method by which a line is drawn from which the actual highs and lows [of past income] are equally given effect so that the line matches the performance and normalizes the highs and lows of a corporation."

Actually, plaintiff apparently used this method more as a check on the company's actual income figure of $88,031,033 for January 1, 1975, and estimated income figure of $100,000,000 for January 1, 1976, figures which plaintiff used in its computations.

Defendant utilized a performance ratio in determining the income value, dividing plaintiff's "adjusted

---

[5] Issues #6, "Material and Supplies" and #8, "Reversionary Value of Plant in Service," were not treated as issues by the parties in their briefs and oral arguments to this court. With regard to issue #6, defendant admitted in its brief to the tax court that materials and supplies should have been included in its determination of a performance ratio for use in projecting income. As for issue #8, the tax court found for the defendant that the salvage of plaintiff's equipment was zero rather than of a negative value.

net utility operating income" by its "average earning plant." The ratio was then applied to plaintiff's "total year end plant" to achieve a value to be capitalized. In developing its performance ratio defendant took as the numerator plaintiff's "adjusted operating income" for 1974, which was determined by taking plaintiff's 1974 reported operating

income of ---------------------------------------------------------------------- $74,246,000,
deducting investment tax credits of --------------------------------- $ 2,349,000,
adding a "provision for deferred income taxes" of ----------------- $ 2,625,700,
and removing the partial year effect of a rate
    increase granted in 1974 of ---------------------------------------- $ 4,865,000,
and adding the annual provision for depreciation
    in 1974 of -------------------------------------------------------------- $27,329,600,
giving an "adjusted operating income" of --------------------------- $96,987,300.

For the denominator defendant took the cost of "average earning plant, including all plant in service, property held for future use, acquisition adjustment and materials and supplies" which

defendant computed to be --------------------------------------------- $1,004,869,000.
The resulting ratio was determined to be ---------------------- 9.65%.
Defendant then took the "total year end plant," the
    cost of the plant including construction work in
    progress (CWIP) at assessment date, at cost of -------------- $1,367,302,600,
and multiplied it by ----------------------------------------------------- 9.65%,
resulting in a "probable future operating
    income" (PFOI) value of ------------------------------------------- $ 131,944,700.
To the PFOI defendant then added the annual effect
    of 1974 rate increases of ----------------------------------------- $ 17,000,000,
and 1975 rate increase of -------------------------------------------- $ 8,580,000,
giving a total income to be capitalized for
    January 1, 1975 of ------------------------------------------------- $ 157,529,700.

## 10. *Income to be Capitalized.*

A basic requirement of the income method is fixing an annual income to capitalize. Plaintiff contends that the income approach should be based on a projection of income expected to flow from the property during the assessment year. Defendant, on the other hand, capitalized the income to be earned "over the remaining life of the property" then earning income, the property being built, and that being planned on the assessment date. At another point defendant described

the income to be capitalized as the "probable future average annual operating income" to be derived from the plant during its life. Actually, defendant used the 1974 assessment year income to develop a performance ratio to be applied to the "total year end plant," or cost of the plant at the end of 1974 to reach an income value to capitalize for January 1, 1975. The total year end plant, however, not only included property generating income as of the assessment date, but also property that would not generate income until years later.

The tax court judge found defendant's estimation of future income to be too speculative for a knowledgeable buyer to consider in fixing a purchase price and too different from plaintiff's actual earnings during the assessment year and, therefore, rejected defendant's estimation.

Defendant responded in its brief to this court that it is to be expected that a reasonable income projection method would substantially exceed plaintiff's actual earnings during the assessment year. Defendant also asserted, as discussed later, that the lower court failed to consider future income from construction work in progress (CWIP) and pending rate increases:

"It is clear here that the 'assessment year' test is irrelevant since a portion of the property that is the subject of this proceeding is not earning income on the assessment date nor in the assessment year, nor do the assessment year earnings represent what will annually flow from the property, namely, there is an absence of full effect of the new rate increases and no effect on income from pending rate cases. Plaintiff's 'assessment year income' is clearly an incorrect projection when compared with the Department's 'annual cash flow projection.'"

Both parties cite the case of *Mt. Bachelor v. Dept. of Rev.*, 273 Or 86, 539 P2d 653 (1975) as support for their positions as to what should be considered the income to be capitalized. In that case the tax court had established the true cash value as of January 1, 1970 and

January 1, 1971 of plaintiff's ski resort by capitalizing the prior fiscal year's income. Defendant argued that that approach failed to take into consideration the growth factor involved in the property attributable to a rising trend in receipts, an additional ski lift installed in the summer of 1970, and a 20 percent increase in the price of ski lift tickets for the 1970-71 ski season. It was not explained in the opinion how defendant included those factors in its own assessment, but it appears that those factors were reflected by using the fiscal year income straddling the assessment date. This court decided that the flow of income to be determined is that which "would be anticipated by reasonable, knowledgeable buyers and sellers as of the assessment date," and that *the rate of change*[6] of past income should be considered along with the past earning performance of the property. 273 Or at 92.

Based on this decision, defendant contends here that CWIP should be included as well as new and pending rate increases in the income to be capitalized. Plaintiff contends in its brief to this court that the case "stands only for the proposition that it is improper to capitalize prior year's income, unmodified to reflect conditions known at the assessment date which would affect future income and value during the assessment year." Defendant counters with the argument that the case mentions nothing with regard to limiting consideration to the assessment year.

As for the *Mt. Bachelor* standard of a "reasonable, knowledgeable buyer," to limit consideration to factors affecting income during the assessment year to some extent restricts the perspective of a reasonable, knowledgeable buyer in that the buyer would probably also consider more long-range factors. However, as between the choice of using a 1974 performance ratio applied to property that will not generate income until years in the future and using historical income data to

---

[6] Unlike in *Mt. Bachelor,* the evidence here does not persuade us that "the rate of change" is a critical element in this case.

determine income of the assessment year, we find the buyer would use the latter method to determine an annual income to capitalize. Future costs and other possible restrictions would make consideration of future income-generating property beyond the assessment year too speculative here. Not only are the costs of these non-income generating CWIP properties incomplete and their multiplication by a performance ratio in which there is no component for CWIP seemingly inconsistent, but by the time all these properties are generating income the 1974 performance ratio may be inapplicable.

Accepting plaintiff's argument based on testimony in this record that it is income earned during the assessment year which should be capitalized in this case, we find the next question is how such income should be determined. As discussed with regard to the performance ratio, under heading #4, plaintiff utilized the least squares method of projecting income. Plaintiff's Exhibit #17 is a graph depicting the least squares method line projected from 1967 to the 1980's, based on actual net electric operating income from 1967 through 1975 and estimated income for 1976. The end of year income represented by the line was $100,000,000 for 1976 as opposed to the actual income for that year of $102,684,517 and an unspecified number but approximately $92,000,000 for 1975 as opposed to the actual income for that year of $88,310,033. Rather than use the 1975 income figure depicted by the least squares method, however, plaintiff used the actual income of the property for that year, and the tax court utilized the actual income of the property for both years.

Plaintiff points out in its brief to this court that because its review appraisals were done for the tax court proceeding, it had available plaintiff's actual year-end 1975 earnings and accurate estimates of the company's 1976 earnings:

"Under these circumstances it was not inappropriate for the appraisers to use Pacific's actual income for

> 1975 as long as such income was reasonably close to an estimate based on past data adjusted for changes expected to take place during the assessment year."

Plaintiff cites the *Mt. Bachelor* case as authority for this proposition. In that case this court accepted use of "the actual income of the tax year in question," though apparently the figures were of the fiscal year straddling the assessment date. In doing so, this court stated that it was not holding that taking the actual income, "inherently unknowable to the assessor on the assessment date, is the proper predictor of anticipated income." 273 Or at 92. Also, the court noted that defendant in using the actual income did so as a concession to the plaintiff and that the actual income was slightly less than that predicted.

■   We do not accept the tax court's use of the actual income figures for the two assessment years as establishing a general rule, nor do we accept plaintiff's position that review appraisals before the tax court may always use the actual income figures of the company rather than that determined by an appraisal method. The determination of value should not be based on the delay of litigation which allows the actual income of a year to be known. However, in this case where the income values are so close to that achieved by the appraisal method and where the parties, other than defendant opposing the use of any measure of income of the assessment year, have not criticized the tax court's use of the actual income figures as opposed to figures determined by the least squares method, we accept the actual income figures.

### 4. *Performance Ratio Used to Project Income.*

As described above, defendant utilized a performance ratio, dividing plaintiff's adjusted utility operating income by its average earning plant, then applying the ratio to plaintiff's total year end plant to achieve a value of probable future annual operating income to be capitalized. Plaintiff criticized use of that approach and utilized instead a least squares method which

produces a trend line based on past earnings extending into the future. The tax court accepted plaintiff's method of projecting income based on the fact of a long history of plaintiff's operations which provided good data on the amount of income and rate of increase of income each year. The court also accepted, as plaintiff contended, that where a utility is under regulation, trended past income provides the best guide to future income. Finally, the court considered that defendant's estimates exceeded the actual net operating income for 1975 by 33 percent and for 1976 by 27 percent, and applied to a five-year period, exceeded actual net operating income by an average of more than 19 percent.

Defendant in its briefs to this court raises several issues. First of all, as discussed under heading #10, defendant asserts that it is to be expected that future earnings estimates will exceed actual earnings for the assessment year because of CWIP and rate increases.

Specifically with regard to the performance ratio as a method of projecting income, defendant contends that this ratio is required to properly take into account the growth of the company. Defendant asserts that the method adopted by the tax court does not take into account that plaintiff is a rapidly growing utility, with $300,000,000 CWIP not in service as of the assessment date, and with new and pending rate increases expected. Defendant cites *Mt. Bachelor* as authority for the proposition that the growth factor as well as the actual income over past years should be considered in anticipating earnings. However, there was testimony that the least squares method does in fact take into consideration the rate of increase of income. Dr. Ring testified on cross-examination:

"Q   And as I understand your method, you would take the operating income for the year '74 as the income to be expected from that property?
"A   No, sir.
"Q   Well —

[545]

"A   I trended it. If you will recall from my exhibit that the income stream at the beginning of the year was $88 million in 1976. I adjusted that upward —
"Q   1976?
"A   — so at the beginning — yes, January 1, 1976. I adjusted that upward from $88 million to $100 million on the basis of the trend experienced by the company in recent years, an upward trend, and I applied that trend and projected it and it came up with $100 million in current dollars."

■ Though the least squares method may produce a conservative amount where the company is just recently rapidly expanding, we find that it is preferable to the performance ratio in this case. The advantage of the least squares method here is of a history of company operations providing data on past income and rate of increases of income, including a reflection of the current rate of increase, while defendant considered only the operating income for the year preceding each appraisal date in developing its performance ratio.

### 5. *Construction Work in Progress.*

ORS 308.510(1) defines "property" subject to taxation and includes "work in progress." CWIP is an account on the Federal Power Commission classification of accounts in which planned expenditures under construction are accumulated until the plant is put in service. At year-end 1974 the company had $314,762,499 in CWIP, at year-end 1975 $289,427,020, and at year-end 1976 an estimated $225,000,000. Approximately 65 percent of the CWIP as of January 1 is "closed to plant in service," or its property becomes operational, in any given year and virtually none on the assessment date or soon thereafter. That portion of CWIP which becomes plant in service during the assessment year usually does not become part of the rate base for a year or more.

The tax court judge found defendant's incorporation of CWIP within its income approach to be improper and that the proper place for valuation of

Defendant included in its income value to be capitalized not only income generated by the property on the assessment date but also income to be generated at some time in the future by property in various phases of construction on the assessment date. The premise for defendant's approach is that once you have accepted as a guide the perspective of a reasonable, knowledgeable buyer as of the assessment date, such a buyer would consider not only current income producing property but also future income producing property not yet generating income.

Beyond the arguments discussed already in favor of the assessment year annual income rather than defendant's projection of future operating income, plaintiff has two basic criticisms of defendant's assignment of income to CWIP. The first criticism is that defendant's method operates under the false assumption that all CWIP will become plant in service, generating revenues and depreciation cash flow, as of the assessment date. Defendant responds in its brief to this court that that assumption "is a coincidence, of the Department's appraisal method, based on the facts." Defendant further contends that to the extent CWIP does not produce earnings until years later, the recognized but unrealized income between the assessment date and the actual earnings date is compensated for by the yearly eight percent added to "the account for allowance for funds during construction period." Allowance for funds used during construction is a sum representing interest or the current cost of money to the company of carrying that plant before it goes into rate base. Mr. Arrowsmith testified that when the CWIP does come on line it does so at a higher earnings base:

> "We are assuming that through the mechanism of accounting for allowance for funds during construction, which are subsequently capitalized into plant

which goes into rate base, that you will, in effect, realize this level of income over the life of the plant, yes, sir."

Plaintiff attacked this approach first because the allowance for funds rate of eight percent was less than the indicated rate of return of the most recent rate order. Defendant did not effectively explain how the eight percent in allowance for funds during construction in fact compensated for the delay in earnings from the assessment date to the actual date of earning. Plaintiff also argued that the approach is conceptually inconsistent with the treatment of CWIP as income-generating as of the assessment date because the allowance-for-funds account would cease when the property does generate income.

Plaintiff's second criticism is that defendant has failed to consider the fact that plaintiff is a regulated utility which necessarily restricts its earnings and delays the contribution to earnings from any CWIP. Plaintiff's rate base is the historic cost less depreciation of the plant in service. This rate base multiplied by the percentage allowed as a rate of return sets the upper limit of the company's earnings. Plaintiff contends that before CWIP which has been put in service can actually earn it must be included in a rate proceeding before the PUC. Actually, it is plaintiff's *allowed* earnings which are directly tied to plant in rate base, and because the company has not been able to earn at its allowed rate as it asserted throughout the tax court proceeding, presumably there may be an increase in earnings without an increase in allowed rates. Mr. Goodman admitted that a new property will generate revenue. However, he added that it will not necessarily earn at existing rates and in fact it will probably generate losses since the revenues that would be derived would probably be less than the expense unless a new rate order is authorized. Also, an addition to the system does not necessarily mean the addition of new customers but may only affect service to existing customers.

Despite these criticisms of the extent to which defendant attributed income to CWIP, plaintiff actually somewhat agreed with defendant's perspective of a reasonable, knowledgeable buyer taking into consideration income to be produced by property not producing as of the assessment date. Mr. Goodman testified that CWIP which will generate net operating income in the immediate future, defined as the assessment year, should be considered in the income approach to value. Dr. Ring also testified that income should be ascribed only to plant which will produce a net income in the foreseeable future, which he defined as the assessment year. Dr. Ring, though, did not ascribe a separate income value to CWIP that would earn during the assessment year. Rather, he testified that his least squares method of determining income naturally included a value for CWIP since the method took into consideration the upward trend of growth of the company. His reasoning is apparently that since a certain amount of CWIP does become income-producing each year, such CWIP is naturally reflected in past annual income and the rate of increase of income. Further, by taking the year-end value of the assessment year, rather than say the median within the year, Ring contended that this resulted in a generous valuation of income for the year.

As did the tax court, we find defendant's approach too speculative. By including all CWIP as of the assessment date in its income approach defendant attributed income not only to property that would begin earning during the assessment year, but also property that would begin to operate but not earn in that year, property that would not be completed for three to four years after the assessment date, and other property not yet even being constructed, which may never be built, and even if built would not be in service for over eight years. This latter category of plant refers to construction work in progress for nuclear plants in Oregon and Washington. While

there was no evidence that any of plaintiff's construction projects had failed to be completed, there was testimony that the fate of these nuclear facilities was uncertain and that the construction of other nuclear plants elsewhere in the country had been abandoned. One possible barrier to construction mentioned was proposed legislation restricting construction.

■ As an alternative to including CWIP in its total year-end plant to be multiplied by the performance ratio to reach the income value to be capitalized, defendant suggested that CWIP just be added at cost to the otherwise determined income value. This was described by the parties as a fractional appraisal, as opposed to a unitary appraisal. Mr. Arrowsmith defined the unitary system of appraisal as the appraisal of "an entire unit as an operating entity by the various means available as opposed to a summation approach to valuation," which is the evaluation of the parts. Mr. Goodman described the valuation of one piece of property as a fractional appraisal. Mr. Bredehoeft testified that where it is not possible to determine the value indicators for the entire unit "then it's necessary to modify the unitary approach and develop a quasi-summation approach." On cross-examination, however, it was revealed that the authorities supposedly supporting this fractional appraisal did not address what was done by defendant. Dr. Ring testified that this mixing of the unitary and summation approaches would be similar to valuing a house as a unit and then adding a room at cost rather than valuing it all as a unit. We need not decide whether fractional appraisals in general are valid, but believe the addition of CWIP at cost to the income to be capitalized is improper here. CWIP is already valued at cost under the cost approach and to also treat its cost as income under the income approach reduces the effectiveness of the two approaches serving as checks and balances on each other. Further, a property would seldom, if ever, earn income in one year equal to its cost, particularly its incomplete construction cost.

## 7. *Rate Increases.*

Based on the testimony and a recognition that "each tax year must stand upon its own feet," the tax court concluded that "only rate increases already granted prior to the assessment date can properly be considered by the appraiser as affecting the cash flow to be capitalized." 7 OTR at 227. The court also found that defendant had exaggerated the return expected due to rate increases already granted, with its estimation of a return of 52 percent of operating revenues while plaintiff had actually been able to achieve only 34 percent.

Defendant asserts that both rate increases granted prior to the assessment date and pending rate proceedings should be considered. Its argument is that a knowledgeable buyer would consider the pending rate proceedings and expect some of the increase to be granted. As described above, defendant removed what it determined to be the partial year effect of rate orders granted in 1974 when defendant computed its performance ratio. After finding a value for total year end plant and multiplying it by the performance ratio to achieve an income value to capitalize, defendant then added values representing the effect of 1974-1975 rate increases. These values were determined, taking the 1975 increase as an example, by adding the additional annual revenue sought, $22,000,000, reducing it by a 48 percent tax rate to $11,440,000, and reducing it again by assuming only 75 percent of the request would be granted to $8,580,000. After the addition of these rate changes, the probable future operating income was capitalized.

Plaintiff's witnesses, Mr. Goodman and Dr. Ring, also testified in favor of considering pending rate cases. However, Dr. Ring testified that the least squares method of projection of income includes consideration of rate changes. Dr. Ring testified on cross-examination:

[551]

"Q   Now set aside the department's projection and I'm asking you about pending rate proceedings and rate orders in effect at or near the assessment date.

"A   Right.

"Q   You would give consideration to those?

"A   I have given consideration to it.

" * * * * *

"Q   As to projecting earnings, are you interested in the immediate ensuing assessment year's earnings?

"A   Absolutely.

"Q   Is that the total basis of the projection?

"A   The projection is on a basis of the last least square line which shows a continued growth and, therefore, in this particular instance, I took the maximum for the end of the years. What I normally should have done is take the median within the year because the company will not earn if the starting increment of a rate increase, let's say in March, before it would take effect, the increment would not be there for the full year. So therefore, actually, statistically, we should take the region between the beginning of the year and the end of the year. I took the end of the year in my projection, which is generous.

"* * * * *

"Q   Well, in this projection on Exhibit 17, are you testifying that the matters affecting earnings, namely, rate orders in effect at or near the assessment date, not yet in operating income for past years or pending rate increase, is reflected on this exhibit?

"A   Only increases known about. There was no increase in 1976. There was an increase in 1975 and that's reflected in here. Any increase — any rate increase that we knew was pending or in effect is reflected in this estimate.

"Q   Well, looking at the year 1976 on Exhibit 17 —

"A   Um-mum.

"Q   — that 100,000 [sic] figure, is that Mr. Hoffmann's estimate?

"A   No, Mr. Hoffmann probably took my estimate.

"Q That's your estimate?

"A My estimate.

"Q But your black line is your projection?

"A Right.

"Q Below that estimate?

"A What do you mean below that estimate?

"Q Well, as I see your — the 100,000 [sic] at the point '76 inter — intersects with —

"A I'm taking —

"Q — 100,000 [sic] —

"A My estimate —

"Q — your projection is below that intersection.

"A My estimate is the end of 1977. I told you I took the end of the year. I took the high estimate. Actually, if you take — the mid-year would be $98,500,000. I took $100,000 [sic]."

As to the tax court's finding that defendant's estimate of a 52 percent return of operating revenues from the rate increases is exaggerated, defendant contends that the rate increase need not correspond to plaintiff's actual experience of earning approximately 34 percent of operating revenues. Rather, defendant argues, the rate orders deal with net operating income, and the expenses of the year at issue are already allowed in the rate proceeding. Only state and federal taxes and any expense increases between the test year used to determine the rate increase and the year when such increase is granted would reduce the net operating income. Defendant allowed for federal taxes, but not state taxes and expenses incurred beyond the test year level. However, there were no federal taxes and defendant argued that that deduction should make up for the state taxes and expenses not figured in.

Plaintiff questioned, however, whether 52 percent of the rate increase was in fact realized by the company. Out of the operating revenues only 34.2 percent in 1974 and 32.9 percent in 1975 resulted in net utility operating income. Plaintiff argues that if in fact 52 percent of the 1974 and 1975 rate cases were realized, then the percentage of net utility operating

income would not have dropped in 1975. The explanation for the drop was regulatory lag and the fact that costs are rising faster than the company is able to secure rate increases.

■ Since the parties agreed that pending rate cases should be considered in determining income, the tax court's conclusion that only rate increases already granted prior to the assessment date should be considered is incorrect. Because defendant's estimation of income from pending rate increases appears to be excessive, and there was no effective rebuttal of plaintiff's position that the least squares method naturally includes the effective rate changes, we accept plaintiff's position here.

### 9. *Defendant's Treatment of Deferred Taxes.*

■ The tax court found that the value for plant built with deferred taxes should not be included in the income indicator of value. As Mr. Bredehoeft testified, the Department separately appraised the value of the property purchased with deferred income tax and added it to the value of the unit, "There was no element of the property purchased with deferred tax included in our unitary valuation. It was added additionally to the end." Defendant's explanation for this appraisal approach was that plant built with deferred taxes was not recognized in the income indicator of value, and since all indicators should reflect the value of the same elements of plant, the impact of deferred taxes should be computed separately and then added to the unitary valuation. Mr. Arrowsmith testified that the value attributed to deferred taxes is "equal to the reduction in rates that the rate payer experiences as a result of having deferred income taxes in the rate of return calculation."

During cross-examination Mr. Arrowsmith admitted that deferred taxes made no difference in value to the owner or to the potential buyer. Under the basic appraisal assumption to which both parties agree, that the goal of assessment is to determine the

market value or what a reasonable purchaser would pay for this property, defendant's focus on value to the ratepayer rather than the potential purchaser is misplaced. Mr. Madden, a public utility security analyst who testified on behalf of plaintiff, testified that from the investor's point of view no value can be attributed to the reserve for deferred taxes.

Mr. Bredehoeft testified, though, that not to value this reserve separately is to ignore "the value of some dollars that the company has in its possession for some length of time to use as it sees fit, to buy other utility property with, or whatever." However, Mr. Goodman testified that this reserve does not have any effect in lowering the company's actual federal income taxes, but merely affects the timing of the payment of those taxes. Also, there is not some kind of a trust account in which actual monies are put into a separate account. The money involved here is in the plant, and the PUC does not allow earnings from plant built with funds derived from deferred taxes. Yet value of the plant built with deferred taxes is reflected in the cost approach and in the stock and debt approach.

### 3. *Depreciation — Flow-Through Accounting.*

Plaintiff also objected to defendant's treatment of deferred taxes and investment tax credits in defendant's income indicator of value because the effect was flow-through accounting, ignoring the regulatory requirements placed on plaintiff which affect value as would be perceived by a buyer of the property. Actually, it was not entirely clear from the record that plaintiff's accounting procedure was required by regulation. There was evidence that permission from the PUC, FPC, and probably the IRS, would be required to make a change to flow-through accounting.

Defendant had taken the present worth of the balance in current deferrals and of the future deferrals and the effect was to flow through something the company had "normalized," as explained by plaintiff's

witness Madden. Mr. Madden gave the following testimony with regard to these accounting procedures:

"Q  Well, Mr. Madden, how does a reserve for deferred taxes arise?

"A  This reserve can arise in several ways. For instance, in 1954, the Congress passed a law permitting companies to adopt accelerated depreciation for new property additions. Over the life of the asset involved, depreciation expense is no greater than what would be allowed under straight-line depreciation. However, the depreciation allowed in the early years of the life is greater, but is offset by a lesser amount of depreciation allowed in the latter [sic] years. At the end of the asset's life, no greater amount of depreciation is allowed than what is allowed under ordinary book straight-line purposes.

"* * * * *

"Q  Does a company's use of liberalized depreciation have any effect on its tax liability?

"A  It results in a lower current tax liability because the depreciation claimed under liberalized depreciation for tax purposes is greater than that recorded on the books for book purposes.

"Q  Now, when you speak of a lower tax liability, is that in any particular period of time?

"A  That reduced tax liability occurs in the early years of the life of that particular asset. This is reversed in the latter [sic] years of the life of that equipment so that over the life of the equipment involved, the tax liability remains the same.

"* * * * *

"Q  Is there any way to smooth out this side effect which you've just described of the use of a liberalized method of depreciation?

"A  Yes, there is. What is normally employed is what has been referred to as normalization.

"Q  And what does this involve?

"A  Normalization involves setting up a deferred tax expense to reflect the difference between the depreciation claimed on the books and the depreciation claimed for tax purposes so as to smooth out the process. If this was not done, operating income in the early years of an asset's life, because of the tax

allowed depreciation, would be overstated while operating income in the latter [sic] years of the asset's life would be understated. By providing this reserve, the income flow from that asset is smoothed out and will be constant, all other things being equal.

"* * * * *

"Q  Well, are there any other methods that are used for accounting for the reduction in taxes that takes place initially because of the use of shorter lives or liberalized methods of depreciation?

"A  Not all companies follow normalization accounting procedures because the regulatory bodies require that to fill — to only record the actual current cash tax expense. This is known as a flow-through method. In this —

"Q  Well, would you please explain exactly what you mean by the flow-through method?

"A  The flow-through method involves the flowing through to income of the tax deferral or the deferred tax expense associated and arising from the difference between the depreciation allowed for tax purposes and the depreciation allowed used on the books in the early years of the life of the asset."

Mr. Madden went on to testify that the effect of the flow-through method would be lower earnings in later years than at present due to higher taxes. The investor would perceive a greater risk in the flow-through company because the company is not recording an expense currently which will have to be recouped later on. Mr. Madden also testified that plaintiff's adoption of normalization in the early 1970's improved its price-earnings ratio which in turn improved the market price of its stock. Defendant did not offer effective rebuttal of this testimony, and Mr. Bredehoeft agreed that the stock value would be higher for the normalizing company.

■  We find that it was improper for defendant to treat plaintiff here as a flow-through company when plaintiff in fact does normalize. Also, a change from normalization to flow-through accounting would affect a buyer's perception of the property's value.

## 2. *Annuity Method of Capitalization — Treatment of Depreciation.*

The capitalization of income involves taking into account the hypothetical purchaser's recovery of his capital which was invested in depreciable property. Plaintiff's approach was to capitalize net operating income, or to deduct depreciation as an expense before capitalization, which is the method the company actually follows. In computing its straight-line method of depreciation plaintiff used the estimates of depreciation which it reports to the Federal Power Commission. Defendant's approach was to capitalize income before depreciation, and to then include a depreciation component within the capitalization (CAP) rate.

In its computations defendant used the Inwood factor, which is merely a reciprocal of the CAP rate to which one has added the depreciation rate. Rather than use dollar amounts of depreciation, this annuity method requires use of a sinking fund rate of depreciation. The formula is: income divided by CAP rate, plus sinking fund factor (determined from CAP rate of 9 percent and 37 year remaining life), plus residual value, equals system value:

$$\frac{157,529,700 + .04123\ (44,180,000)}{.090 + .00387} \qquad 1,679,990,300,$$

which × (times) .3369 allocation factor     569,988,700,
defendant's January 1, 1975 valuation.

Dr. Ring gave this description of the alternative methods of capitalization:

"There are, in fact, a number of sinking funds, some that are acceptable for use in one instance and some that may be accepted for regulated industry and, of course, there are some that are unacceptable in the application. To illustrate, all methods described in most valuation textbooks are sinking funds. There is a sinking fund that bears no interest. The sums needed for plant retirement are placed in a reserve or fund for depreciation to be available for instant use for both regular and emergency retirement of plant. This sinking fund is known as the straight-line

[558]

method. This fund or method is used almost exclusively by all interstate public utilities in this country. Another method of modification of the straight line provision for depreciation is to place periodic or annual provisions for plant retirement in an interest-bearing fund at what we call a safe rate. This sinking fund is known as the safe interest-bearing sinking fund. A third method of a sinking fund applicable only where funds are to be set aside or can immediately be reinvested instantaneously at a risk-bearing interest rate is known as the annuity method of depreciation. This method should only be applied where income stream is level and under firm contract."

It is this third method, through its reciprocal the Inwood factor, which defendant utilized here.

Plaintiff contends and the tax court agreed that defendant's method essentially involved "double counting" in that defendant was assuming that the income stream to be capitalized would remain constant, which required reinvestment in plant to keep the rate base and thus income from declining, and that at the same time the depreciation would be invested in a sinking fund at the risk rate.

Defendant argues in its briefs to this court that the tax court's interpretation of the annuity method of capitalization is incorrect because "the Inwood method does not necessarily assume reinvestment." It is not clear whether defendant is asserting that reinvestment in plant is unnecessary to maintain the income stream, or that the depreciation may be invested in a sinking fund from which reinvestment in plant may be made, or just that reinvestment in plant may be made which will earn at the same rate as a sinking fund.

Even assuming that defendant's method of capitalization only involves reinvestment in plant, plaintiff criticizes defendant's use of the Inwood factor because the rate of return on the depreciation is assumed to be the same as the CAP rate. Since the utility is required to invest its depreciation in plant to keep its income

stream constant, and since the utility did not earn at the defendant's CAP rates of 9 percent and 9.5 percent for the assessment years in question, the annuity method is inapplicable here. In fact the utility was not allowed to earn a rate of 9 percent or 9.5 percent on its rate base for those years.

In its briefs to this court defendant states that if the Inwood factor should not be applied here, then the Hoskold factor should be used. This factor also involves capitalization before depreciation, but applies a riskless rate of return to the sinking fund. While Dr. Ring testified that this factor would be more applicable than the Inwood factor to a utility company, he still disagreed with its use. First of all, he asserted it required, along with Inwood, a detailed depreciation study of each of the major plant units involving eight to nine months work, to figure the depreciation component of the CAP rate. The sinking fund requirements of the individual categories of plant would be added and set aside to provide for replacements and retirements as they fall due. Defendant, though, used the 37 year life of the plant as a whole "as a reasonable approximation in lieu of an actual life study." Dr. Ring also asserted that defendant's 37 year remaining life of the whole plant was excessive, considering the increasing number of steam plants being built as opposed to hydro plants in the past. Further, he disagreed with the 7 percent risk rate applied by defendant, mentioning instead the possibility of a 3 percent rate.

In rebuttal defendant quoted from Def. Ex. D, "Appraisal of Railroad and Other Public Utility Property for Ad Valorem Tax Purposes," Report of the Committee on Unit Valuation, National Association of Tax Administrators (1954), which states, at page 5, that proponents of the procedure of capitalizing before depreciation claim that even crude estimates of remaining life will give superior results to those derived from capitalization after depreciation. Not only is this reasoning not explained in the record but another

authority cited by defendant in support of its capitalization before depreciation appraisal method, "Report of Committee on Railroad and Utility Valuation," Western States Association of Tax Administrators (1971), states at page 15, that "in closely regulated companies there is possibly a persuasive argument that the book depreciation expense is a proper allowance rather than providing for depreciation in the capitalization rate."

While from the record it does appear that the Hoskold method could be used here, the validity of the appraisal presented by defendant utilizing that method is too unclear to be used instead of plaintiff's straight-line method. It may be that the straight-line method of depreciation is too conservative, but the proper determination of remaining life of the property and of the riskless rate of return to be used in the Hoskold method were insufficiently explained.

## 11. *Rate of Capitalization.*

The process of capitalization is described in the record as the calculation of the present worth of an expected future stream of income over the life of the property. Defendant computed capitalization rates of 9.0 percent for 1975 and 9.5 percent for 1976 based on a determination of a moving five-year average of annual capitalization rates published with respect to other public utility companies. Plaintiff contended that this averaging resulted in a capitalization rate lower than the actual rate for the year end and thus in an inflated valuation. The lower the CAP rate, the higher is the indicated value. The court agreed with plaintiff that the CAP rates would not be less than the rates of 13.13 percent for 1974 and 12.29 percent for 1975. These figures were based on a market study by a Mr. Lanz, employed by plaintiff as an Assistant to the Vice President, Finance.

Both parties utilized the band of investment method to determine a rate of capitalization. Dr. Ring gave the following description of this method:

"Well, a capitalization rate is really a composite of the elements of or costs of money that go into the makeup of the rate of capitalization. The methods by which a rate of capitalization is obtained, there are three of them. One would be the band of investment method whereby we visualize the enterprise being made up of capital segments or bands. Let's say 40 percent bonded indebtedness — that bonded indebtedness would be a band of 40 percent. Taking 100 percent as the total capital requirements, one band would be the debt capital which, for our illustration, let's say is 40 percent. The second band would be the cost of preferred capital which, for our illustration, let's say is 10 percent. And the third band would be the equity capital which, in this illustration, would be 50 percent."

Defendant weighted the capital segments as 42.1 percent and 42.2 percent for common stock, 7.7 percent and 7.8 percent for preferred stock, and 50.2 percent and 50 percent for debt for the two assessment years, respectively. Plaintiff weighted 33.4 percent and 36.4 percent for common equity, 9 percent and 10 percent for preferred stock, and 57.6 percent and 53 percent for long-term debt. Although the percentages do differ, the parties do not argue over the weightings. Rather, they disagree over the methods used to determine the values of each segment, and particularly the cost of preferred stock and debt, and over defendant's five-year averaging.

With regard to this averaging, defendant contends that the interest rates of 1974 and 1975 were not typical, and that the practice of not allowing transient fluctuations in costs of money to swing the values of utility properties up and down from year to year is justified in seeking true cash value.

■ Plaintiff asserts that to use a five-year average CAP rate to capitalize estimated earnings for a single year is improper because in an inflationary economy this results in a CAP rate which is always lower than the CAP rate for the current assessment year. We

agree with plaintiff that the appraiser should look to more current costs of money in developing the CAP rate and that defendant's long-range values for utility properties based on the prior five-year period are too low.

In the alternative defendant suggests use of the rates of 10.2 percent and 11.3 percent for the two years. Those percentages were the single-year rates for 1974 and 1975 used by defendant in computing its five-year average.

Plaintiff criticizes defendant's determination of these CAP rates because defendant used figures compiled in Moody's Public Utility Preferred Stock and Bond Group Average Yields which plaintiff contends are not representative. They are allegedly not representative because the rates do not represent the cost of capital at the end of the year but rather the average of yields for the year, because the figures are not restricted to newly issued preferred stocks and bonds, and because in 1975, for example, out of 76 preferred stocks issued, Moody's reflected only 10.

As for the time period to be reviewed in determining a proper rate of capitalization, defendant argues that the rates over the past year should be considered while plaintiff argues that only the cost of capital at the end of the year should be considered. Mr. Lanz considered the cost of bonds and preferred stock issued within 45 days to year-end. Mr. Goodman testified that the period of time he would consider "would be a matter of two or three months." Dr. Ring testified that it is proper to consider rates over the past year to determine the CAP rate for the appraisal date: "But normally what we do is take an average for the year and look back to the past merely as to whether the amount or the rate that we've arrived at is reasonable * * *." Though he considered defendant's rates a little low for the two years, Dr. Ring accepted them.

As for plaintiff's argument that defendant's study should have been restricted to newly issued preferred

stocks and bonds, Mr. Lanz pointed out that Moody's figures include secondarily traded issues. His reasoning was that since the CAP rate should reflect the current cost of money, only newly issued preferred stocks and bonds should be considered. Defendant did not rebut this testimony and in fact did not bother to cross-examine Mr. Lanz.

As for Moody's public utility figures not being representative of the industry, although plaintiff criticizes defendant's use of the figures for the January 1, 1975 assessment because they reflect only 10 utilities' issues during 1974, plaintiff for its study used only one issue of bonds and one issue of preferred stock. To the extent a wider sampling is desirable, as plaintiff contends, its own study is less satisfactory than that of defendant. In addition, both issues used by plaintiff occurred in January 1975, and thus were data unknowable to the assessor on the assessment date. Plaintiff's data for January 1, 1976 was based on December 1975 data but again was of only one issue of bonds and one of preferred stock.

■ Though perhaps a good case may be made for using more current data than that of the prior year and for considering only newly issued preferred stocks and bonds, plaintiff's study here is not as satisfactory as that of defendant's. The evidence preponderates in support of defendant's figures of 10.2 percent for 1975 and 11.3 percent for 1976.

Applying these rates to the income figures of $88,031,033 for 1975 and $102,684,517 for 1976 results in income values of $863,049,343 and $908,712,540 for the two years, respectively. Using the weightings of 60 percent for income, 30 percent for cost, and 10 percent for stock and debt, plus the allocation factors and other required adjustments, results in assessment values of $347,404,299 for January 1, 1975, and of $348,314,521 for January 1, 1976.

Modified and remanded to the tax court for entry of a decree in accordance with this opinion. Costs to neither party.