DECISION
Plaintiff appeals the real market value of property identified as Account 1736006 (subject property) as determined by the Lane County Board of Property Tax Appeals Order, dated February 26, 2010. A trial was held in the Oregon Tax Courtroom, Salem, Oregon, on April 6, 2011. W. Scott Phinney, Attorney at Law, appeared on behalf of Plaintiff. Rick M. Bean (Bean), Broker, testified on behalf of Plaintiff. David Sohm (Sohm), Registered Appraiser, Lane County Assessment and Taxation, appeared on behalf of Defendant.
Plaintiff's Exhibits 1 through 16 and Defendant's Exhibit A were admitted without objection.
 I. STATEMENT OF FACTS
The subject property was described by Bean as a 240 unit low income "section 42" apartment complex built in 2006 and located in Eugene, Oregon. (Ptf's Exs 1 — 3.) In determining the 2009-10 real market value of the subject property, Bean testified that he relied on the income approach to determine the subject property's real market value. He testified that, in 2006, the subject property was "leasing up" and, by 2008, it was "fully occupied." Bean testified that, for each calendar year from 2006 through 2010, he used audited financial statements, or budget or actual annualized data, to compute net operating income. *Page 2 
(Ptf's Exs 5-8.) Sohm compared the financial information used by Bean to financial information he received in December 2010 from Plaintiff's attorney, who responded that audited financial statements were made available to him after he sent the financial information to Sohm. Sohm, who also relied on the income approach to determine the subject property's real market value, testified that he computed a "stabilized net operating income" by combining the "actual 2008 and actual 2009" values. (Def's Ex A at 1.) He testified that he "threw out" an expense identified as "asset management fee," in the amount of $130,774. Plaintiff challenged Sohm's approach, characterizing it as a hybrid method that can be used to determine specially assessed value but not real market value.
Sohm questioned the estimated vacancy rate, 12.8 percent, used by Bean. (Id.) Bean testified that he did not question the audited financial information provided by Plaintiff and had no knowledge if there was a waiting list for housing like the subject property. He testified that the "tenant pool" for properties like the subject property "is smaller because there are income qualifications and those who meet the income qualifications could lack the ability to pay the rent." Plaintiff submitted a rent roll dated as of October 20, 2009, stating that 25 units were vacant and advance rent had been received from at least one future tenant. (Ptf's Ex 9.) Sohm testified that he used a 10 percent vacancy rate. (Def's Ex A at 1.)
Sohm questioned Bean about the replacement reserve. Bean testified that he consulted the "Realty Rate" report dated "4th Quarter 2009," stating that the apartment minimum per unit average reserve requirement was $150, maximum was $380, and the typical rate was $350 per unit. (Ptf's Ex 13.) Bean testified that, for the subject property, he used $250 per unit as a "conservative" replacement reserve rate. He testified that it is "absolutely important that there be replacement reserve" because "not having reserves artificially inflates value." *Page 3 
After questioning each other about the components of net operating income, the parties conceded that their computed operating net incomes are almost the same and the difference is not material to the determination of real market value.
Neither party included property taxes among operating expenses. In determining the property tax rate to add to the capitalization rate, Plaintiff computed a ratio of the real market tax roll value divided by Plaintiff's requested real market value, multiplying that ratio times the current rate for "government" and "other," and adding the "education" tax rate, .5 percent, to arrive at a property tax rate of 1.5 percent. (Ptf's Ex 12 at 1.) Sohm testified that he followed the Oregon Department of Revenue's rule for computing the effective tax rate. He testified that he computed an "effective tax rate" by taking the "actual tax rate," $18.5408 per thousand, multiplying it times the "changed property ratio," .53, to arrive at a property tax rate of .983 percent. (Def's Ex A at 1.) Plaintiff argued that, because the subject property is in "compression," the "Department of Revenue's rule" does not work.
The parties disagree as to the capitalization rate. Bean testified that, because "it was a bleak time," there "wasn't a lot of capitalization rate data" available. He testified that he looked to "national" data sources, noting that according to "Realty Rates" the capitalization rate was 9.1 percent for apartment properties with more than 90 units that sold during first quarter 2009 in "Portland/Salem," the "closest market" to the subject property's location. (Ptf's Ex 10.) He testified that he did not have "any information about the age or location or the number of properties that sold or if any of the properties were low income apartments." Bean referenced articles describing the "coming commercial crash" and "The Great Commercial Real-Estate Crash" and commented that "investors were scared." (Ptf's Exs 14 and 15.) Sohm testified that he relied on four sales in the Eugene/Springfield area to determine a capitalization rate. *Page 4 
(Def's Ex A at 2 — 5.) Those sales were recorded April 19, 2007; July 12, 2007; March 27, 2008; and July 31, 2008. (Id.) Sohm testified that he put the most weight on the July 2008 sale because it was the closest to the assessment date, January 1, 2009. He testified that, based on the information provided to Defendant, he computed an "Indicated Overall Rate (Discount and Reca [sic][)]" of 6.89 percent. (Def's Ex A at 5.) When asked why he did not include any sales after September 2008, Sohm responded that there were "no large property sales after July 2008." Plaintiff responded that Sohm failed to adjust the sales for "time" and the "change in the market place."
The parties agree that a risk adjustment should be added to the capitalization rate because the subject property is a property with governmental restrictions. Bean testified that it is appropriate to add a risk adjustment because "investors need to be compensated for lower liquidity, rent controls, compressed tenant pool, government inspection and higher maintenance standards." Both parties added 35 percent for a risk adjustment to their capitalization rates. (Ptf's Ex 4; Def's Ex A at 1.)
Using the income approach, Bean determined the subject property's 2009-10 real market value to be $8,500,000. (Ptf's Ex 4.) He testified that, even though he considered the sales comparable approach, he concluded that, because the subject property was a "Section 42 property" there were "limited sales to choose from," "more adjustments" to the sales would be required, it would require an "MAI to complete an economic study," and a "less reliable" determination of real market value would be determined. Sohm testified that, based on the income approach, he determined the subject property's 2009-10 real market value to be $10,780,000. (Def's Ex A at 1.) *Page 5 
 II. ANALYSIS
The issue before the court is the 2009-10 real market value of Plaintiff's property. "Real market value is the standard used throughout the ad valorem statutes except for special assessments."Richardson v. Clackamas County Assessor, TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003) (citing Gangle v. Dept. ofRev., 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1), [1] which reads:
 "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's length transaction occurring as of the assessment date for the tax year."
A. Approaches of Valuation — Real Market Value
There are three approaches of valuation (cost, income, and comparable sales) that must be considered in determining the real market value of a property even if one of the approaches is found to not be applicable. See ORS 308.205(2); OAR 150-308.205-(A)(2). The subject property is an apartment complex, an income-producing property. Even though Bean considered the comparable sales approach, both parties relied on the income approach.
B. The Income Approach
The income approach "relies on the assumption that a willing investor will purchase a property for an amount that reflects the future income [that the property will produce]."Allen v. Dept. of Rev., 17 OTR 248, 253 (2003). The income approach is widely used when appraising income-producing properties. Although there are two techniques for determining the expected future income, direct capitalization and discounted cash flow, both appraisal reports relied upon the direct capitalization analysis approach to determine the subject property's real market value. *Page 6 
The income approach determines the flow of income that a reasonable and knowledgeable buyer would anticipate if purchasing the subject property on the assessment date. PacificPower Light Co. v. Dept. of Rev.,286 Or 529, 542, 596 P2d 912 (1979). The income approach should also consider the past earnings of the subject property and the rate of change of its income. Id. The parties have each determined a net operating income that is close to $1,100,000 per year exclusive of property tax expense. (Def's Ex A at 1; Ptf's Ex 4 at 1)
The main issue before the court is the overall capitalization rate. There are three components of the overall capitalization rate: the capitalization rate, the property tax rate, and the risk adjustment rate. There is no disagreement that the risk adjustment rate is computed by multiplying 35 percent times the capitalization rate.
Looking first at the capitalization rate, Plaintiff determined a capitalization rate using "RealtyRates.com MARKET SURVEY — 1st Quarter 2009" for the "Portland/Salem" area for "Class A B Apartments — 90+ Units." (Ptf's Ex 10 at 2.) With respect to real estate, the key is location, location, location. Plaintiff is asking this court to accept the conclusion that a 90 unit apartment located in Portland or Salem would have the same average sale price and overall average rate as a similar property located in Eugene. The court notes that the reported net operating income for "Portland/Salem", $430, is less than the subject property's net operating income, suggesting that the average sale price in Eugene could be higher. (Id.) Plaintiff presented no evidence of comparable sales in the Eugene area to support its capitalization rate.
Sohm computed a capitalization rate using four sales of properties he identified as comparable to the subject property. He concluded that the indicated overall rate, 6.9 percent, of a sale closing on July 31, 2008, was the correct capitalization rate. Plaintiff alleges that, because *Page 7 
there are few, if any, sales after the financial crisis was known in September 2008, Defendant has understated the capitalization rate.
Plaintiff raised a legitimate concern about the sale date of Defendant's comparable sales but failed to present its own comparable sales to support its capitalization rate. Plaintiff relied on data for the "Portland/Salem" area without adjustment. Plaintiff submitted no evidence showing that "Portland/Salem" properties are comparable to both the subject property and other similar properties sold in Eugene. "In all proceedings before the judge or a magistrate of the tax court and upon appeal therefrom, a preponderance of the evidence shall suffice to sustain the burden of proof. The burden of proof shall fall upon the party seeking affirmative relief * * *." ORS 305.427. Plaintiffs must establish their claim "by a preponderance of the evidence, or the more convincing or greater weight of evidence." Schaefer v. Dept. ofRev., TC No 4530, WL 914208 at *2 (July 12, 2001) (citingFeves v. Dept. of Rev, 4 OTR 302 (1971)). Plaintiff failed to carry its burden of proof. The court accepts Defendant's capitalization rate of 7 percent (rounded).
Looking next at the property tax rate, Plaintiff computed a rate based on its requested real market value. This court has previously concluded that relying on a requested value to determine a property tax rate is circular analysis. The court accepts Defendant's property tax rate of 1 percent (rounded).
To determine a property's real market value, the direct capitalization analysis divides the forecast net operating income, $1,100,000, of the property for the tax year by the overall capitalization rate, 10.45 percent. The court concludes that the subject property's 2009-10 real market value is $10,500,000 (rounded). According to the evidence submitted, the subject property's 2009-10 maximum assessed value and assessed value is $7,504,304. *Page 8 
(Ptf's Compl at 2.) For the court to order a change in real market value to the tax roll, Plaintiff must be aggrieved. ORS 305.275(1)(a). To be aggrieved, the ordered change to the tax roll must result in a property tax reduction. The court was not presented with evidence to determine whether a property tax reduction would result from the court's determination of the 2009-10 real market value.
 III. CONCLUSION
After careful review and consideration of the testimony and evidence, the court concludes that the subject property's real market value for tax year 2009-10 is $10,500,000. Now, therefore,
IT IS THE DECISION OF THIS COURT that the 2009-10 real market value of property identified as Account 1736006 is $10,500,000 and the tax roll will be adjusted only if Plaintiff is aggrieved.
Dated this _____ day of June 2011.
If you want to appeal this Decision, file a Complaint in theRegular Division of the Oregon Tax Court, by mailing to:1163 State Street, Salem, OR 97301-2563; or by hand delivery to:Fourth Floor, 1241 State Street, Salem, OR.
 Your Complaint must be submitted within 60 days after the dateof the Decision or this Decision becomes final and cannot bechanged.
 This document was signed by Presiding Magistrate Jill A.Tanner on June 8, 2011. The Court filed and entered this documenton June 8, 2011.
[1] References to the Oregon Revised Statutes (ORS) and Oregon Administrative Rules (OAR) are to year 2007.
 *Page 1