# IN THE OREGON TAX COURT

## GEORGIA-PACIFIC CORPORATION
*v.*
## DEPARTMENT OF REVENUE
(TC 1828)

John C. Caldwell, Hibbard, Caldwell, Bowerman, Schultz & Hergert, P.C., Oregon City, represented plaintiff.

G. F. Bartz, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Decision for defendant rendered April 24, 1984.

### SAMUEL B. STEWART, Judge.

The plaintiff appealed defendant's Opinion and Order No. VL 82-299 determining that the true cash value of the subject property, on January 1, 1980, was approximately $108,500,000. The subject property is improvements only, excluding certain specific property, of the Toledo pulp and paper mill owned by Georgia-Pacific and located at Toledo, Oregon. The plaintiff alleged at time of trial that the plant was worth less than one-half the amount alleged by defendant and

should be valued at no more than $43,000,000 on January 1, 1980.

The parties agreed that adequate data of comparable sales was not available; therefore, the market approach was not utilized in a conclusion of value. The plaintiff offered a cost approach based upon a projected replacement cost of the plant under optimum conditions (Plaintiff's Trial Memorandum, at 8), an income approach and a dividend-paying capacity approach. (Plaintiff's Exhibit 2, at 9-14.)

The defendant offered a cost approach based upon a reproduction cost new and a replacement cost estimate. The defendant contended that an income approach to value was not acceptable in appraising industrial properties for ad valorem taxation purposes. The defendant alleged that, in appraising an industrial plant, the income approach "has no merit whatsoever because of a number of reasons." (Tr 315.) These reasons, enumerated in defendant's Exhibit A, at 8, concern the difficulty of estimating various elements necessary for the income approach as well as the question of reliability of data furnished by the owner of the subject property since intercompany transfers are often involved and data can be manipulated.

Notwithstanding the foregoing, the defendant contended that:

"ORS 308.411 specifically mandates the use of the cost approach or the income approach where there is no 'market' found for the property.

"ORS 308.411 * * * is a reaffirmation of the method used by the Department in its techniques of appraisal. The rules of the Department are as valid and binding as the statute if properly promulgated and reasonable. The Department has followed ORS 308.411 and its rules. Unless the court finds the rules invalid they must be followed." (Defendant's Memorandum, at 5.)

ORS 308.411 was enacted in 1981 and became effective January 1, 1982 (1981 Or Laws ch 139, § 2; HB 2928) and, therefore, has no bearing upon the case at issue. Even if the statute were relevant to this case, only an owner may elect to exclude the income approach to value. The statute allows the department no similar choice. In the present case, the owner specifically relied on an income approach to determine true

cash value. In addition, the department has promulgated no rule regarding ORS 308.411; therefore, the court finds the defendant's statements quoted above not relevant in the instant case.

■    On the relevant date, ORS 308.205 stated that "[t]rue cash value of all property, real and personal, means market value as of the assessment date" and the statute mandates that true cash value "shall be determined by methods * * * in accordance with rules and regulations promulgated by the Department of Revenue." The department's rule, OAR 150-308.205-(A) 2., as of December 31, 1979, states:

> "Real property shall be valued through the market data approach, cost approach and income approach. Any one of the three approaches to value, or all of them, or a combination of approaches, may finally be used * * *."

This rule was amended in 1981 to state:

> ■ "Any one or more of the three approaches to value may finally be used, except in these cases when taxpayer elects to have industrial plant appraised as provided in ORS 308.411."

This rule does not support the defendant's contention that "the income approach has no merit whatsoever" in appraising an industrial property. This unqualified rejection of one of the accepted valuation methods in an appraisal technique is contra to the court's statement in *Pacific Power & Light Co. v. Dept. of Rev.*, 286 Or 529, 538, 596 P2d 912 (1979). Justice Lent wrote:

> "We find that the limitations of the three approaches pointed out by the parties should go to determining the weight to be given the individual approaches rather than to completely eliminating two of the approaches from consideration. * * * [The approaches] also serve as a check and balance upon one another."

The plaintiff's income approach was based upon the Toledo mill's earning capacity. The plaintiff's appraiser, Dr. John H. Davis, alleged that a potential purchaser of the Toledo mill would expect to earn approximately $8,900,000 net profit after taxes. Dr. Davis based this allegation upon an average of net profit after taxes for the years 1975 through 1979.

Dr. Davis explained that in making an estimate of

value based upon an income approach he requests financial statements of the subject. "In particular, we're asking for an income statement and a balance sheet. A balance sheet was not available because the Toledo mill operation was not kept separate from other operations so there was not a distinct balance sheet for it * * *." (Tr 190.)

The appraiser stated that he was satisfied that the income statement was an accurate representation of the financial condition of the mill and that he relied upon it for the basis of his income approach.

Mr. Larry Bray, employed by plaintiff as a "chip" buyer, agreed in his testimony that since chips are one of the major raw materials used by the Toledo mill, a variation in the price that was used on company records could have a direct effect on the income of the plant. (Tr 84.)

Mr. Bray testified that a substantial amount of chips was bought from plaintiff and he admitted that during the period of 1975-1979 there was a 70-cent difference between the cost for softwood chips within the company versus the outside market. (Tr 95.)

Dr. Davis emphasized that "the Profit and Loss Summary on the Toledo mill was examined in great detail." (Plaintiff's Exhibit 2, at 12.)

Dr. Davis was asked, "[d]id you verify the — the fact that the chip cost difference was, over a five-year period, in softwood chips, averaged 70 cents, as Mr. Bray said?" (Tr 224.) Dr. Davis replied: "I verified the profit and loss summary * * *. Those are the statements that I went over and satisfied myself that they were accurate representations of what was taking place at that mill." (Tr 225.)

In estimating a net profit after tax figure, the witness began with the plaintiff's monthly "Profit and Loss Summary" and applied a 50 percent tax factor to account for statutory federal and state taxes. The Investment Credit Income or Investment Tax Credit was applied to determine net profit after taxes.

The plaintiff's Exhibit 2, at 11, shows that, for years 1975 through 1979, the net profit before taxes, in round figures, was $12,000,000, $18,000,000, $15,000,000,

$13,000,000 and $27,000,000. In response to a question asking why a five-year average was used when a possible interpretation might be that the 1979 profit represented the prediction of future income, Dr. Davis replied: "Because 1979 is so out of line with all the rest of the figures, we wanted to verify why it was so high * * * and we were able to satisfy ourselves that it was most unusual that this occurred * * *." (Tr 251-252.) Dr. Davis discussed the factors involved in the surge in profit in 1979. (Tr 204.) No explanation was given for the 1976 increase in net profit before taxes in excess of 63 percent over the preceding year. (Plaintiff's Exhibit 2, at 11.)

The witness testified that no weighting effect was applied to the five-year average because in such a process primary emphasis is placed on the last year and 1979 was not a representative year. (Tr 253.) In reference to the income approach offered, the plaintiff's appraisal (Plaintiff's Exhibit 2, at 11) states:

"It can be seen from the above figures [of yearly net profits] that 1979 was an unusually profitable year. Every indication, as of January 1, 1980, was that general economic conditions and conditions in the pulp and paper industry were deteriorating and that net profits after tax for the Toledo mill would be adversely affected."

However, the plaintiff's *1979 Annual Report,* dated February 8, 1980, states:

"Prospects for pulp, paper and chemicals look relatively bright in 1980 despite a weakening economy. Pulp and paper inventories are low, demand remains substantial, supplies are relatively tight and exchange rates are currently favorable for export—all of which will help insulate that sector from the general economic downturn." (Defendant's Exhibit C, at 5.)

Dr. Davis was asked if he brought past year dollars up to 1979 dollars in order to compare profit in 1975 and other years with that in 1979. He answered, "[n]o, we did not feel that was necessary." (Tr 254.) No explanation was offered the court why plaintiff's replacement cost analysis does consider the cost of the plant in 1980 dollars (Tr 160) but plaintiff's income approach does not equate earlier profits with 1980 dollars. Plaintiff's determination of value via the income approach was $51,000,000. (Plaintiff's Exhibit 2, at 13.)

Based upon estimated annual earnings of $8,900,000,

the plaintiff offered a dividend-paying capacity approach utilizing average dividend payout percentages and dividend yields from comparable companies to arrive at an alleged true cash value of $54,000,000. (Plaintiff's Exhibit 2, at 14.) The plaintiff stated:

"The Toledo mill does not pay dividends. The Georgia-Pacific Corporation pays dividends based on earnings from all operations. However, for valuation purposes, it will be assumed that the Toledo mill can pay dividends at the projected earnings level." (Plaintiff's Exhibit 2, at 14.)

The plaintiff's dividend-paying capacity approach relies not only upon the above assumption but also upon the plaintiff's estimate of the plant's annual earnings. In developing the estimated earnings, plaintiff's witness laid a less-than-solid foundation. The dividend-paying capacity approach, dependent upon the projected earnings estimate, is consequently weakened.

Both the plaintiff and defendant offered a replacement cost new approach to valuation of the subject property (land valued at $969,000 is not controverted). (Plaintiff's Exhibit 2, at 17.) The plaintiff's estimate of replacement cost is $627,069,000 (Plaintiff's Exhibit 2, at 10) versus the defendant's alleged cost of $213,349,210 (Defendant's Exhibit A, at 34). The extreme difference between the two estimates is apparently due to the plaintiff's use of more expensive state-of-the-art equipment and an increase in capacity of the plaintiff's hypothetical plant over the existing facility. The plaintiff's replacement plant had a production capability of 1,600 tons per day.

Mr. Patrick Ballard, Director of Corporate Planning and Economic Analysis for Rust International, testifying for the plaintiff, stated:

"[T]he Toledo mill was producing about 1,200 tons of — of production per day. We would replace that facility in 1-1-80 with a 1,600-ton per day facility on that site and then we derived, from a set of capital cost curves, what that size mill would have cost in 1-1-80 dollars." (Tr 160.)

The court was apprised that the plaintiff's expert appraisal witness, Dr. Davis, did not base his cost approach "on an appraisal as such. It is an engineering evaluation as to what it would cost to replace the mill. * * * Dr. Davis has taken

those engineering figures [prepared by Rust International] on a replacement facility, * * *." (Tr 192.) However, the appraisal report prepared by Dr. Davis refers to the "present 1,400-plus tons-per-day capacity mill." (Plaintiff's Exhibit 2, at 5.) Accepting Rust International and the defendant's findings that the subject mill has a 1,200 ton-per-day capacity, the plaintiff's replacement plant has a 33 1/3 percent more production capability than the facility being appraised (1,600 tons versus 1,200 tons).

The use of state-of-the-art technology and equipment is proper but the capabilities of two facilities must be comparable or adjustments must be made to equalize the differences before the cost of one can correctly represent the value of the other.

The plaintiff offers adjustments to the replacement cost figures by subtracting $41,065,714 for physical and functional obsolescence. The plaintiff arrived at this number by estimating the annual savings to be obtained by using the hypothetical replacement facility rather than the existing facility and capitalizing the alleged savings at 17.5 percent. (Plaintiff's Exhibit 1, at 4-22; Plaintiff's Exhibit 2, at 10.) This figure of $41,065,714 is not broken down into its physical obsolescence component and its functional obsolescence component, nor was a visual inspection made by the plaintiff's appraiser to verify physical obsolescence.

The plaintiff then subtracted economic obsolescence of $535,146,143. The plaintiff states: "The test for economic obsolescence is to determine if there is a shortfall in earnings based on projected earnings of the mill prior to modernization." (Plaintiff's Exhibit 2, at 9.) The plaintiff arrives at the amount of economic obsolescence by projecting a return on the cost of the hypothetical plant's assets at a 17.5 percent return on investment and subtracting the projected earnings of the existing plant over the same time period. The difference is capitalized at 17.5 percent, resulting in the plaintiff's conclusion of economic obsolescence in the amount of $535,146,143.

The plaintiff measures all of the estimated obsolescence of the existing facility by measuring the estimated savings in expenses obtained through use of the hypothetical facility and by measuring the estimated increased earning

capacity of the hypothetical facility. The plaintiff subtracted a total of $576,211,857 in obsolescence (Plaintiff's Exhibit 2, at 10) from an allegedly comparable hypothetical facility which produces one-third more than the subject plant.

Plaintiff's estimate of economic obsolescence is derived from plaintiff's income appraisal analysis which concludes that an investor in a new replacement plant would demand a rate of return of 17.5 percent. (Plaintiff's Exhibit 2, at 13.) This 17.5 percent was then assumed to indicate what the replacement plant would produce as expected earnings. At this point the comparability of the hypothetical plant and the existing plant is critical. If the replacement plant has a production capacity one-third greater than the existing plant, the capital expenditures and earnings should be larger for the replacement facility. Greater earnings would inflate the amount of obsolescence deducted, based upon the disparity in earning ability of the existing plant as compared to the replacement plant.

Based upon visual inspections, the defendant's cost approach was supported by a detailed study containing estimates of reproduction costs new of the real property improvements involved and their estimated depreciated reproduction costs. A similar study involving a replacement cost new analysis was offered based upon a hypothetical facility with the same production capacity as the subject facility. (Defendant's Exhibits A and D.)

The plaintiff's appraisal using the cost approach was based upon an engineering study derived by "a set of capital cost numbers from our capital cost curves that are based upon our many years of experience." (Tr 160-161.) No inspection of the plant was made to estimate physical deterioration. Dr. Davis testified that "[w]e were able to determine, through a technical study done by Rust Engineers, that these particular items represented certain physical and functional obsolescence." (Tr 241-242.)

The court accepts the defendant's cost approach as more accurately reflecting the value of the existing plant due to the appraiser's on-site inspection in arriving at the amount of physical obsolescence and the break down of functional obsolescence on an asset-by-asset basis. This specificity in analysis is more persuasive than the plaintiff's reliance upon

the engineering study of the overall plant without a personal inspection of the assets by the appraiser.

As noted above, plaintiff's income approach and dividend-paying capacity approach were flawed by lack of data supporting certain decisions made by the appraiser. Having found the plaintiff's cost approach less convincing than the defendant's, the court must deny the plaintiff's appeal. Therefore, the court affirms defendant's Opinion and Order No. VL 82-299 and sustains the values appearing on the 1980-1981 assessment and tax rolls of Lincoln County, Oregon.