DECISION
The appeal concerns the real market value (RMV) of certain real property for three tax years: 2006-07, 2007-08, and 2008-09. The property is identified in the Clackamas County tax records as Accounts 05002104 and 00337996. The appeals are taken from various Orders of the Clackamas County Board of Property Tax Appeals (BOPTA).
A trial was held on September 14 and 15, 2009, in Salem, Oregon. Christopher K. Robinson, Attorney at Law, represented Plaintiff. Testifying as witnesses were W. Grant Norling, fee appraiser, Bob LeFeber, broker, and John Zupan, grocer. Kathleen J. Rastetter, Assistant County Counsel, represented Defendant. Testifying as witnesses were Ronald R. Saunders, county appraiser, and Mike Parnell (Parnell), subject property owner/lessor. Subsequently, written submissions were filed; the record closed October 16, 2009. *Page 2 
 I. VALUES AT ISSUE
The following table summarizes the total RMVs urged by the parties:
Tax Year BOPTA Plaintiff — Trial Defendant — Trial
2006-07 $7,382,295 $4.0 million $8,134,971
2007-08 $8,726,168 $4.1 million $8,134,971
2008-09 $9,965,492 $4.1 million $8,134,971

 II. STATEMENT OF FACTS
The subject property is a large commercial structure and land located at 17711 Jean Way in Lake Oswego, Oregon. There are over 40,000 square feet of net rentable area in the improvements. (Ptf's Ex 1 at 5). There are 171 open asphalt parking spaces and mature landscaping with timed underground sprinklers. (Id. at 24.) The land totals 2.88 acres and is zoned General Commercial with a Jean Way Site Zone Overlay. (Id. at 5) After its construction, the leased fee position of the subject was sold to an investor in a sale leaseback transaction. (Ptf's Ex1 at 57.)
The subject property construction was completed in June of 1997 and first occupied by a Natures Foods store. It was leased to Plaintiff for a 25-year term beginning in September 1999. (Def's Ex A at 37.) On the assessment dates, Plaintiff was the lessor of the subject property. (Id.) It then became vacant in April of 2005 when Wild Oats moved to a nearby, but much superior, location at Bridgeport Village. (Id.) The property has not been occupied since that time, despite diligent efforts of brokers and other real estate professionals. There is a long-term lease in place with about 18 years remaining. (Id.) During the assessment period at issue, the net rent charged was $706,650, or $20.58 per square foot. (Id.) *Page 3 
The parties agree that the key to solving this valuation conundrum is first establishing the property's highest and best use (HBU) as of the three assessment dates. Although they agree that the HBU was the same on each date, they strongly disagree as to which
permitted use was most appropriate.
Plaintiff argues that the HBU was as a partial conversion to amulti-tenant destination commercial use. (Ptf's Ex 1 at 38.) That is strongly influenced by the physical layout of the site, the Jean Way Overlay zoning restrictions and the prohibition of a single occupant. Evidence was presented as to the past actual use not conforming to zoning under a single-tenant retail scenario. The property owner, Parnell, testified that it was "clear that another grocer would not be allowed to go into that space."
Defendant argues that the HBU was the continued use as a retail store similar to the original design and prior use of the property by the Wild Oats market store. (Def's Ex A at 35). The appraiser saw no difficulty with the area zoning, the Jean Way Overlay, or the grocery competition in the area.
Since the property became vacant in 2005, there have been various lease proposals the landlord has received while marketing the site for lease.[1] Between 2004 and 2008, at least five potential uses were considered by third parties. Those included alternative enterprises such as retail, grocery store, education facility, religious, and even a bowling alley. (Ptf's Ex 1 at 58.) None of those proposals became a leasing reality.
Despite these facts, Defendant concluded that the property would likely be leased to a single tenant. (Def's Ex 1 at 53). As a result, the analysis did not allow any necessary expenses for stabilization, preparation, or partitioning the large space. *Page 4 
As to valuation approaches, the parties examined all three accepted methods of deriving RMV. They agreed that the cost approach was not relevant for the instant situation. The court concurs and will not include a complete review of that or other subsidiary valuation studies.
The income approach is an accepted method for valuation of such commercial retail and office properties. For their income approaches to value, the parties presented market data as to rent, vacancy, expenses, and capitalization rates.
Plaintiff's appraiser placed "substantial weight" on his income approach. He presented five comparable properties in his "Retail Rent Summation Table." (Ptf's Ex 1 at 45.) They were all located within a reasonable distance from the subject property; three were in the immediate vicinity. The adjusted rent per square foot ranged from $9.61 to $15.96. (Id.) In the "Office Rent Summation Table," five other sites were offered. (Id. at 50.) The triple net adjusted rent per square foot ranged from $10.50 to $17.50. (Id.) Again, three were located in the immediate vicinity. From five selected transactions, Plaintiff selected a capitalization rate range of 7 percent to 8.0 percent. (Id. at 62.) Plaintiff's income approach conclusion was an RMV of $3,820,000 as of January 1, 2006. (Id. at 64.)
Defendant placed the most weight on its income approach. For that methodology, the appraiser presented twelve leased properties; they were all food retail outlets. (Def's Ex A at 41.) They were located from Wilsonville, Oregon to Vancouver, Washington. (Id.) Many were sited in strip malls and the like with other adjacent uses. The rents ranged from $14.71 to $26.55 per square foot. (Id.) The appraiser concluded $18 for the subject. (Id. at 50.) His capitalization rate was based on eight sales transactions ranging from 6.0 percent to 7.62 percent. The appraiser selected 7.0 percent for his final analysis. (Id. at 52.) *Page 5 
The parties each examined a market sales comparison approach to value. Those included sales properties, their sales dates, and various adjustments for differences in condition, size, location, and other pertinent factors.
Plaintiff placed "significant weight" on its sales comparison approach. Five market transactions were identified and presented. (Ptf's Ex 1 at 66.) They occurred from January 25, 2005 through December 1, 2006. (Id.) The sales prices ranged from $82 to $159 per square foot. (Id. at 71.) After adjustments, the appraiser concluded $130 per square foot for the retail component and $80 per square foot for the office component on the ground level and mezzanine. (Id. at 72.) Finally, consideration was given to other components such as conversion costs, leasing commissions, rent loss, and overhead. The RMV for that approach was concluded to be $4,110,000 as of January 1, 2006. (Id. at 74.)
For its sales comparison approach to value, Defendant's appraiser presented four improved sales comparables. (Def's Ex A at 54). They were located in Vancouver, Washington and the Oregon cities of Portland, Beaverton and Oregon City. (Id.) The transactions occurred from October 2005 through August 2007; the range in age was from 1961 to 2004. (Id.) The sales prices spanned from $2,850,000 to $19,528,330; this corresponds to a price per square foot of $129.55 to $307.46. (Id.) The appraiser concluded $245 per square foot for the subject. (Id. at 59.)
As for reconciled final value conclusions as of January 1, 2006, Plaintiff found an RMV of $4 million. (Ptf's Ex 1 at 74.) Defendant's final RMV was more than double that at $8,134,971. (Def's Ex A at 60.) *Page 6 
 III. ANALYSIS
The court's assignment is to determine the RMV of Plaintiff's property as of January 1, 2006, 2007, and 2008. ORS 308.205(1)[2]
defines real market value as:
 "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."
The court looks for "arm's length sale transactions of property similar in size, quality, age and location" to the subject property in order to reach a correct RMV. Richardson v. ClackamasCounty Assessor, TC-MD No 020869D, WL 21263620 *3 (Mar 26, 2003).
There are three common methods used to determine RMV: (1) the cost approach; (2) the sales-comparison or market comparable sales approach; and (3) the income approach. Allen v. Dept. of Rev.
(Allen), 17 OTR 248, 252 (2003). See also
OAR 150-308.205-(A)(2)(a) (stating that all three approaches to valuation of real property must be considered, although all three may not be applicable to the valuation of the subject property).
The income approach "relies on the assumption that a willing investor will purchase a property for an amount that reflects the future income [that the property will produce]." Allen,17 OTR at 253.
The income approach determines the flow of income that a reasonable and knowledgeable buyer would anticipate if purchasing the subject property on the assessment date. PacificPower Light Co. v. Dept. of Rev.,286 Or 529, 542, 596 P2d 912 (1979). The income approach should also consider the past earnings of the subject property and the rate of change of its income. Id. Plaintiff's appraisal calculations were all supported by substantial evidence and explained through the expert testimony. *Page 7 
Highest and best use is defined as "[t]he reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, and financially feasible and that results in the highest value." Appraisal Institute, TheAppraisal of Real Estate 277-278 (13th ed 2008). The concept of market value or RMV assumes that market forces will seek the maximum benefits from property. Based on the evidence presented in this case, the court finds that the highest and best use of the subject property, as of the assessment date in question, was as a combination of separate entities of mixed commercial retail and office spaces.
The evidence clearly establishes that a single competing retail grocery store is not the HBU of the property in its entirety. John Zupan, a prominent sophisticated operator, emphatically identified the problems as site accessibility, area competition, and building configuration. The Jean Way Overlay clearly impacts the permissible uses of the property. The uncertainties are such that the court cannot reliably ignore the conclusions assumed by Defendant's HBU determination. That, in turn, renders the bulk of Plaintiff's financial analysis of a superior quality for the immediate appraisal assignment.
Even if the single grocer concept was allowed, the evidence shows that the immediate area is above capacity with that use in superior locations. There is simply no demand for another grocery store (or large single retail operator) in the subject property area, especially given the proximity and great impact of Bridgeport Village.
The comparables offered by Plaintiff were of greater utility. They were, for the most part, closer in location, age, and size. The adjustments were better supported by the evidence and convincing testimony.
Plaintiff has the burden of proof and must establish its case by a "preponderance" of the evidence. See ORS 305.427. A "[p]reponderance of the evidence means the greater weight of *Page 8 
evidence, the more convincing evidence." Feves v. Dept. ofRevenue, 4 OTR 302, 312 (1971). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof." Reed v. Dept. of Rev.,310 Or 260, 265, 798 P2d 235 (1990). Plaintiff in this case has clearly met that statutory requirement. Accordingly, its appeal must be granted.
 IV. CONCLUSION
The best evidence of value is that offered by Plaintiff and its many appraisal documents. The values for each year shall be set as Plaintiff has stated above in Section I of this decision. Defendant may allocate between land and improvements consistent with the neighborhood. Now, therefore,
IT IS THE DECISION OF THIS COURT that the appeal is granted.
Dated this ___ day of June 2010.
If you want to appeal this Decision, file a Complaint in theRegular Division of the Oregon Tax Court, by mailing to:1163 State Street, Salem, OR 97301-2563; or by hand delivery to:Fourth Floor, 1241 State Street, Salem, OR.
 Your Complaint must be submitted within 60 days after the dateof the Decision or this Decision becomes final and cannot bechanged.
 This Decision was signed by Magistrate Jeffrey S. Mattsonon June 2, 2010. The court filed and entered this Decisionon June 2, 2010.
[1] They are presented in detail in Plaintiff's Exhibit 1 at page 58.
[2] All references to the Oregon Revised Statutes (ORS) and Oregon Administrative Rules (OAR) are to 2005.