IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

PASTEGA INVESTMENT COMPANY )
LLC, )
       )
       Plaintiff, ) TC-MD 150284N
       )
       v. )
       )
BENTON COUNTY ASSESSOR, )
       )
       Defendant. ) **FINAL DECISION**

This Final Decision incorporates without change the court's Decision, entered April 18, 2016. The court did not receive a statement of costs and disbursements within 14 days after its Decision was entered. *See* TCR-MD 16 C(1).

Plaintiff appeals property identified as Account 421029 (subject property) for the 2014-15 tax year. A telephone trial was held on January 11, 2016. David E. Carmichael, Attorney at Law, appeared on behalf of Plaintiff. Daniel R. Orman (Orman), Certified General Appraiser, testified on behalf of Plaintiff. Richard D. Newkirk (Newkirk), Registered Appraiser, appeared and testified on behalf of Defendant. Plaintiff's Exhibit 1 and Defendant's Exhibit A were received without objection. Plaintiff objected to the relevance of Defendant's Exhibit B, a 2011 appraisal report prepared by Orman for another property in Corvallis, and the court excluded Defendant's Exhibit B. Plaintiff objected to Defendant's Exhibit D, which was not timely exchanged pursuant to Tax Court Rule-Magistrate Division 12 C(1)(a). The court excluded Defendant's Exhibit D. The parties filed written closing arguments on January 25, 2016.

/ / /

/ / /

/ / /

## I.  STATEMENT OF FACTS

A.     *Subject Property Description and Market*

The subject property is a 10.82 acre parcel of industrial zoned land located in Corvallis, Oregon.[1]  (Ptf's Ex 1 at 2, 4.)  It is zoned General Industrial (GI).  (*Id.* at 4.)  Orman testified that the subject property has access to Walnut Boulevard, immediately to the south of the subject property, and likely also has some access from Belvue Street and Jack London Street.  (*See* Def's Ex A at 27.)  He testified that the subject property does not have access to Highway 99W due to the railroad tracks in between the subject property and Highway 99W.  (*See id.*)  Orman testified that the subject property is located immediately east of the Pepsi-Cola plant in Corvallis.  (*See id.*)  Newkirk testified that his description of the subject property was similar to Orman's.  (*See* Def's Ex A at 6.)  He testified that he agreed that the subject property lacks access to Highway 99W, although it has temporary access through the Pepsi-Cola plant.  (*See id.* at 13.)

Orman testified that the subject property is located near a commercial development anchored by a Big K department store and a Safeway.  (*See* Ptf's Ex 1 at 13; Def's Ex A at 27.)  He testified that the commercial development includes retail stores, restaurants, and a cinema off of Circle Boulevard.  (*See id.*)  "Located behind the Big K and Safeway (to the south) is a 17.57 acre parcel that was developed with a Home Depot in 2007.  Part of this larger parcel is three smaller lots zoned for industrial use.  One of these lots was recently improved with a vehicle storage lot for the US Forest Service; the other two lots are available for sale."  (Ptf's Ex 1 at 13.)  Orman testified that the commercial development along Circle Boulevard is of a different quality than the subject property and does not benefit the subject property.  He testified that the subject property is surrounded by heavy industrial uses with some residential uses on its east side.  (*See*

---

[1] The subject property is 471,319 square feet.  (Ptf's Ex 1 at 4.)

*id.* at 14.)  Orman wrote that, in addition to the Pepsi-Cola plant, other developments in the subject property's vicinity include "Sprick roofing, a mini-storage, and a warehouse building." (*Id.*)  The Hewlett-Packard campus "is located along NE Circle Boulevard, between Highway 99W and Highway 20."  (*Id.*)

Orman testified that the Corvallis population grew from 2010 to 2014 and had low unemployment relative to the state of Oregon.  (*See* Ptf's Ex 1 at 12.)  He testified that Corvallis is one of the "thriving communities" in Oregon.  Orman testified that he anticipated a 12 to 18 month marketing time for the subject property.  (*Id.* at 7.)  He testified that that is a rough estimate of how long it would take to sell the subject property at his real market value conclusion, and it is supported by his comparable sales.[2]

B.      *Plaintiff's Valuation of the Subject Property*

Orman testified that he has 27 years of experience appraising commercial and industrial properties.  To determine the subject property's real market value as of January 1, 2014, he relied upon five sales of industrial zoned land in Corvallis, as well as a time-trended 2009 sale of a 3.7 acre parcel of land that is now part of the subject property.  (*See* Ptf's Ex 1 at 25-27.)

Orman testified that he confined his search for comparable sales to ones within a couple years of January 1, 2014, because sales more remote in time from the assessment date tend to be less comparable due to changes in market conditions over time.  (*See* Ptf's Ex 1 at 24.)  His sales occurred between January 28, 2011, and October 29, 2014.  (*Id.* at 27.)  Orman testified that he found industrial land had appreciated after the recession of 2008-09.  (*See id.* at 25.)  He determined a monthly appreciation of 0.92 percent "[b]ased on the unit value difference between

/ / /

---

[2] Orman testified that his comparable sale 1 was on the market for 306 days, or 10 months; sale 2 was on the market 120 days, or 4 months; and sale 3 was on the market 434 days, or 14 months.

Comp 5 and Comp 1 * * *." (*Id.*) Orman testified that he adjusted his comparable sales to January 1, 2014, using a time adjustment of 0.92 percent per month. (*See id.*)

Orman testified that all of his comparable sales were zoned for industrial use and had a similar highest and best use as the subject property. (*See* Ptf's Ex 1 at 27.) He testified that all of his comparable sales were smaller than the subject property, but he could not find any larger sales within a reasonable time of January 1, 2014; they ranged from 1.09 to 4.31 acres. (*See id.*) Orman testified that larger parcels tend to sell for less per square foot than smaller parcels.

Orman testified that all of his sales were located about four miles south of the subject property. (*See* Ptf's Ex 1 at 28.) He testified that the south Corvallis market is inferior to the north Corvallis market, but he thinks that his sales provide the best indication of the subject property's likely selling price as of January 1, 2014. (*See id.* at 25.) Orman's comparable sales indicated adjusted values ranging from $2.87 to $3.63 per square foot. (*Id.*) Orman testified that, based on his comparable sales, if the subject property were located in south Corvallis, it would likely sell for $3.50 per square foot. (*See id*. at 25-26.) However, he determined a higher value was supported due to the subject property's location in north Corvallis. (*See id.*)

Orman testified that a 3.70 acre parcel that is now part of the subject property sold for $3.50 per square foot in November 2009 after it was actively marketed for $5.00 per square foot. (*See* Ptf's Ex 1 at 6, 26.) He testified that the 2009 sale was between unrelated parties: the seller, RCW Properties LLC (R.C. Wilson), and the buyer, Mario Pastega. (*See id.* at 26; Def's Ex A at 15.) Orman applied his 0.92 percent per month time trend to the 2009 sale and found it indicated a price of $4.87 per square foot as of January 1, 2014. (*Id.*) Due to the larger size of the subject property as compared with the 3.70 acre parcel, Orman concluded that a price of $4.50 per square foot was supported. (*See id.*)

Orman concluded the subject property's real market value was $4.50 per square foot, or $2,120,000, as of January 1, 2014. (*Id.* at 26.) He testified that his value conclusion represents a 28.5 percent upward adjustment from the $3.50 per square foot indicated by his comparable sales. Orman testified that the 28.5 percent upward adjustment reflects the difference between the superior north Corvallis location of the subject property and the inferior south Corvallis location of his comparable sales.

Newkirk testified that he did not find Orman's sales to be comparable to the subject property because they were all located in south Corvallis, an inferior market to north Corvallis, where the subject property is located. He thought it was important to focus on the north Corvallis market. With respect to the 2009 sale of 3.70 acres that became part of the subject property, Newkirk testified that it was the last remaining parcel of R.C. Wilson's estate, after Wilson passed away in July 2006. (*See* Def's Ex A at 15.)

Orman testified that north Corvallis is superior in all respects to south Corvallis for retail development, and it is generally superior to south Corvallis for residential development. He testified that, for industrial development, the only requirements are utilities and close access to primary routes; proximity to residential development is not an advantage. Orman testified that he thinks north Corvallis is superior to south Corvallis for industrial purposes and made a 28.5 percent adjustment to account for that difference, but he does not think the difference is as significant as for residential or commercial uses.

C.      *Defendant's Valuation of the Subject Property*

Newkirk testified that he has been a registered appraiser since 2002 and was previously a certified general appraiser in Missouri. (*See* Def's Ex A at 37.) To determine the subject

/ / /

property's real market value as of January 1, 2014, Newkirk relied upon two comparable sales and four comparable listings. (*See id.* at 28.)

Newkirk testified that his comparable sale 1 was the only reported sale with similar zoning, size, and neighborhood as the subject property; it was the June 2006 sale of 11.08 acres of land for $6.73 per square foot to develop a Home Depot. (*See* Def's Ex A at 21.) He testified that Home Depot was one of the buyers. (*See id.*) Newkirk testified that his comparable land listings 2 and 3, each at $9.00 per square foot, were listed by Corvallis Station LLC. (*Id.* at 22-23.) He testified that his references to "current listings" 2 and 3 were as of January 1, 2014, but he thought those properties were still listed as of the trial date. (*See id.*) Newkirk testified that his comparable land listings 4 and 5, at $10.39 and $10.29 per square foot, were located in the Mixed Use Employment (MUE) zone and listed by the Bridgid W. Allen Trust. (*See id.* at 24-25.) He testified that his comparable land sale 6 at $7.70 per square foot occurred in July 2014; the 0.88 acre parcel was zoned Mixed Use General Commercial (MUGC). (*See id.* at 26.)

Newkirk testified that he applied a qualitative analysis to his comparables and determined that comparable listings 2 through 5 were superior to the subject property primarily because of their smaller sizes. (*See* Def's Ex A at 28.) He concluded that sales 1 and 6 were about equal to the subject property. (*See id.*) Newkirk testified that he reviewed data from the CoStar Industrial Report on the Portland industrial market and concluded that neither industrial flex space vacancies nor rental rates changed much from 2007 through 2014. (*See id.* at 30.) Newkirk testified that, according to data from the Willamette Valley MLS, the Corvallis residential market in 2014 was about the same as in 2007; the average sale price of residential single family homes was $306,718 in 2007 and $306,782 in 2014. (*See id.* at 31.) Newkirk testified that four paired sales of commercial properties in Corvallis revealed a "very nominal"

increase of about 4.64 percent between 2006 and 2014. (*See id.* at 32.) Based on his review of that market data, Newkirk concluded that the $6.73 per square foot sale price of his comparable sale 1 in 2006 provides a good indication of the subject property's real market value as of January 1, 2014. (*See id.*)

Newkirk concluded that his comparable sales 1 and 6 indicated a value range of $6.73 to $7.70 per square foot. (Def's Ex A at 34.) He noted that, if comparable sale 1 were increased by 4.64 percent, as indicated by his paired sales analysis, it would indicate a value of $7.04 per square foot. (*Id.*) Newkirk concluded the subject property's real market value was $7.00 per square foot, or $3,300,000, as of January 1, 2014. (*Id.*)

Orman testified that he did not use Newkirk's comparable sale 1 from 2006 because it was dated and indicative of what big box stores pay for land. He testified that he discussed the Home Depot sale with the seller's representative and learned that the negotiations for that sale occurred in 2002. Orman testified that the Home Depot sale included some entitlements; the selling party had to obtain approval of site development plans prior to closing at a cost of $300,000 so the site was "shovel ready" the day after closing. He testified that the Home Depot sale indicates a value of $6.00 per square foot, adjusted for the entitlements. Orman testified that he did not use Newkirk's comparable sale 6 because it was very small and zoned MUGC.

Orman testified that he did not use current listings because they show what a buyer wants to receive, not a completed market transaction. He testified that Newkirk's listings 2 and 3 have been on the market since 2006 and the current owner is now trying to rezone those properties to commercial because they have not sold. Newkirk's listings 2 and 3 are zoned GI, like the subject property. Orman and Newkirk agreed that some retail use, such as a Home Depot, is allowed in the GI zone. Orman testified that there had been a pending sale of Newkirk's listing 3 for $6.00

per square foot, but the sale fell through. Newkirk testified in response that the adjusted sale price for the useable area of listing 3 would have been $8.00 per square foot and Orman agreed. Orman testified that Newkirk's listings 4 and 5 have been on the market since the early 2000s and were zoned MUE.

D. *Tax Roll Values*

The subject property's 2014-15 tax roll real market value was $3,299,233, and its 2014-15 maximum assessed value of $2,562,160. (Compl at 2.) The board of property tax appeals sustained the subject property's 2014-15 real market value. (*See id.*)

## II. ANALYSIS

The issue before the court is the real market value of the subject property for the 2014-15 tax year. ORS 308.205(1) defines real market value:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."[3]

The assessment date for the 2014-15 tax year was January 1, 2014. *See* ORS 308.007; 308.210.

There are three approaches to value that must be considered to determine the real market value of real property: the sales comparison approach, the cost approach, and the income approach. *See* Oregon Administrative Rule (OAR) 150-308.205-(A). In a particular case, all three approaches may not be applicable; however, each approach "must be investigated for its merit." *Id.* Whether any one approach is more persuasive in a given case "is a question of fact to be determined by the court" based on the record before it. *Pacific Power & Light Co. v. Dept. of Revenue*, 286 Or 529, 533, 596 P2d 912 (1979). In addition to the three approaches to value, a recent sale of the subject property "is important in determining its market value. If the sale is a

---

[3] The court's references to the Oregon Revised Statutes (ORS) are to 2013.

recent, voluntary, arm's length transaction between a buyer and seller, both of whom are knowledgeable and willing, then the sales price, while certainly not conclusive, is very persuasive of the market value." *Kem v. Dept. of Rev.*, 267 Or 111, 114, 514 P2d 1335 (1973).

Plaintiff bears the burden of proving its case by a preponderance of the evidence. *See* ORS 305.427. "Preponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). To meet its burden, Plaintiff must "provide competent evidence of the [real market value] of [its] property." *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002). Competent evidence of real market value "includes appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents, and licensed brokers." *Danielson v. Multnomah County Assessor*, TC-MD 110300D, WL 879285 (Mar 13, 2012).

A.    *The Sale of Part of the Subject Property*

Under *Kem*, a recent, voluntary, arm's-length sale of the subject property provides persuasive evidence of the subject property's real market value. In November 2009, 3.70 acres of land that comprises part of the subject property sold for $3.50 per square foot. That sale occurred over four years before the January 1, 2014, assessment date. Orman acknowledged in his report that "the sale occurred during a time of weaker market conditions due to the economic downturn in 2008 and 2009, which extended into 2010." (Ptf's Ex 1 at 26.) He sought to account for the change in market conditions with an upward time adjustment of 0.92 percent per month, which resulted in a real market value of $4.87 per square foot as of January 1, 2014. Ultimately, Orman thought that a lower real market value of $4.50 per square foot was supported for the subject property given that it is larger than the 3.70 acres that sold in November 2009.

The November 2009 sale of 3.70 acres of the subject property was not "recent" as of January 1, 2014, due to the market changes during that time period. Orman's time trend of 0.92 percent per month provides some help to adjust the sale price to January 1, 2014, but is not sufficient to meet Plaintiff's burden of proof absent other evidence.

B.      *Sales Comparison Approach*

Both appraisers used the sales comparison approach to value the subject property. The sales comparison approach "may be used to value improved properties, vacant land, or land being considered as though vacant." *Chambers Management v. Lane County Assessor*, TC-MD 060354D, WL 1068455 at *3 (Apr 3, 2007) (citations omitted). Under the sales comparison approach, "only actual market transactions of property comparable to the subject, or adjusted to be comparable" may be used and all sales "must be verified to ensure they reflect arm's-length market transactions." OAR 150-308.205-(A)(2)(c). To be comparable, properties should be "similar in size, quality, age and location" to the subject property. *Richardson v. Clackamas County Assessor*, TC-MD 020869D, WL 21263620 at *3 (Mar 26, 2003.)

Orman relied upon five sales of industrial land in a development in south Corvallis. The sales occurred between January 28, 2011, and October 29, 2014. Orman made time adjustments using his time trend of 0.92 percent per month, and found that his sales indicated adjusted values ranging from $2.87 to $3.63 per square foot. He concluded that his comparable sales indicated a real market value of $3.50 per square foot for the subject property.

Newkirk questioned the comparability of Orman's sales given that they were all located in south Corvallis, a location that both he and Orman agreed was inferior to the subject property's location in north Corvallis. In order to adjust for the subject property's superior location, Orman determined its real market value was $4.50 per square foot as of January 1,

2014, which is 28.5 percent more than the value of $3.50 per square foot indicated by his comparable sales in south Corvallis. The time-trended sale of part of the subject property provides additional support for Orman's 2014-15 real market value conclusion of $4.50 per square foot.

Newkirk did not consider any sales of industrial land in south Corvallis because he considered that area to be inferior to the subject property's location in north Corvallis. Instead, he focused only on properties in north Corvallis. Evidently there were few recent sales of industrial land in north Corvallis, because Newkirk relied upon two sales and four listings to determine the subject property's real market value as of January 1, 2014. Listings are not "actual market transactions" and are given little weight in this analysis. OAR 150-308.205-(A)(2)(c).

Of the two sales identified by Newkirk, one occurred in June 2006, over 7.5 years before the January 1, 2014, assessment date. Orman testified that, according to the seller's representative, the sale was negotiated even earlier in 2002. Newkirk did not make any time adjustment to that sale, but nevertheless concluded that it provided a good value indication for the subject property as of January 1, 2014. He supported that conclusion using CoStar data on vacancy and rental rates in the Portland industrial property market, home prices in the Corvallis residential market, and four paired sales of commercial properties in Corvallis.

Although the court agrees with Newkirk that the 11.03 acre parcel of industrial land was very similar to the subject property with respect to its size, location, and zoning, the court is not persuaded that the price paid for that parcel in June 2006 provides persuasive evidence of the subject property's real market value as of January 1, 2014, absent any adjustment for time. Evidence from the Portland industrial market and from the Corvallis residential and commercial markets does not support the conclusion that the market for industrial land in Corvallis was

unchanged between 2006 and 2014. To the contrary, Orman determined that industrial land prices were impacted by the recession of 2008-09, and did not begin to recover until 2011.

Newkirk's second sale was a 0.88 acre parcel zoned MUGC that sold for $7.70 per square foot in July 2014. That sale was closer in time to the January 1, 2014, assessment date. However, it was zoned commercial rather than industrial. Thus, it could be developed for different uses than the subject property and may have a different highest and best use than the subject property. No adjustment was made for the different zoning of that property.

C.      *Reconciliation*

Orman supported his real market value conclusion of $4.50 per square foot with actual sales of industrial zoned land in Corvallis and a time-adjusted 2009 sale of part of the subject property. The primary weakness of Orman's comparable sales was the fact that they were all located in the inferior south Corvallis area. Orman acknowledged that deficiency and made an adjustment for the inferior location of his comparable sales. The court observes that Orman's sales were all smaller than the subject property. However, both Orman and Newkirk agreed that smaller parcels tend to sell for more per square foot than larger parcels. That suggests that any adjustment for the size of Orman's comparable sales would be downward.

Newkirk tried to find comparable sales from the north Corvallis area, but produced only four listings, a sale from 2006, and a sale of commercial zoned property. That evidence is insufficient to rebut Orman's evidence supporting a finding that the subject property's real market value was $4.50 per square foot, or $2,120,000, as of January 1, 2014.

/ / /

/ / /

/ / /

III.  CONCLUSION

After careful consideration, the court finds that the subject property's real market value was $2,120,000 as of January 1, 2014.  Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is granted.  The 2014-15 real market value of property identified as Account 421029 was $2,120,000.

Dated this ___ day of May, 2016.

_____
ALLISON R. BOOMER
MAGISTRATE

***If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.***

***Your complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed.  TCR-MD 19 B.***

***This document was filed and entered on May 6, 2016.***