IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

NIKKI ROUDA and JENNIFER ROUDA, )
)
Plaintiffs, ) TC-MD 160206N
)
v. )
)
CLATSOP COUNTY ASSESSOR, )
)
Defendant. ) **FINAL DECISION**[1]

Plaintiffs appeal the real market value of property identified as Account 22265 (subject property) for the 2015-16 tax year. A telephone trial was held on December 6, 2016. Alex Robinson, Attorney-At-Law, appeared on behalf of Plaintiffs. James Dowley (Dowley), certified residential real estate appraiser, testified on behalf of Plaintiffs. L. Catherine Harper, Senior Appraiser, and Steven S. Gibson (Gibson), registered appraiser, appeared on behalf of Defendant. Gibson testified on behalf of Defendant. Plaintiffs' Exhibits 1 to 4 and Defendant's Exhibit B were received without objection. Defendant's Exhibit A was received over Plaintiffs' objection to the cost approach analysis. Plaintiffs' objection will be considered in weighing the cost approach analysis.

## I. STATEMENT OF FACTS

A. *Subject Property Description*

The subject property is a large, single-family residence in Astoria. (*See* Ptfs' Ex 1 at 1.) Gibson testified that, based on blueprints and actual measurements, he calculated the subject property to include 15,843 square feet, comprised of 4,797 on the first floor; 2,864 on the second

---

[1] This Final Decision incorporates without change the court's Decision, entered April 10, 2017. The court did not receive a statement of costs and disbursements within 14 days after its Decision was entered. *See* Tax Court Rule–Magistrate Division (TCR–MD) 16 C(1).

floor; 1,100 on the third floor; 2,180 of living space in the basement; and 4,902 of unfinished space in the basement. (*See* Def's Ex B.) In addition, he calculated that the subject property includes 1,191 square feet of finished space in the garage and 1,881 square feet of unfinished space in the garage. (*See id.*) The subject property's above-grade living area contains 12 rooms, including 4 bedrooms and 3.1 bathrooms. (Ptfs' Ex 1 at 2.) The subject property has three fireplaces, a patio, a covered porch, and an elevator. (*Id.* at 1.) Dowley testified that it also has an indoor swimming pool and a "mother in law" unit, although those parts of the subject property were not finished as of January 1, 2015. He testified that the subject property is a high-end construction and was built as a "trophy home," with many features and amenities. (*See id.* at 3.) Dowley wrote that the subject property "is an over improvement * * * due to its overall size, and certainly its level of quality [, which] is at the very high end of home construction in Astoria." (*Id.*) Gibson concurred that the subject property was "overbuilt" for its area.

Dowley described the subject property as built in 2004 with an effective age of four years. (Ptfs' Ex 1 at 1.) He testified that the subject property construction began in 2004 and continued through 2009, at which point it was still not complete, but had received a certificate of occupancy. (*See id.* at 3.) Gibson listed the subject property's "effective year" as 2013 and determined it was 94 percent complete as of January 1, 2015. (Def's Ex B.)

The subject property's improvements are situated on a 22,216-square foot, or 0.51-acre, site. (Ptfs' Ex 1 at 2; Def's Ex B.) The site is "located at the end of a cul de sac" and "offers panoramic views of the city, river, and coastline[.]" (Ptfs' Ex 1 at 3.)

B.      *Sale of the Subject Property*

Columbia State Bank (the bank) foreclosed on the subject property in February 2013 and listed it for sale in May 2013 for $2.4 million. (*See* Def's Ex A at 6.) The bank reduced the

listing price to $1.9 million in April 2014, to $1.75 million in June 2014, and to $1.35 million in October 2014. (*Id.*) The subject property went under contract in March 2015 and closed in May or June 2015 for $1,185,000.[2] (*See id.*; *see also* Ptfs' Ex 2 (seller's counteroffer).) Dowley testified that he considered the sale to be a typical bank-owned sale; the bank was trying to recoup its costs. He testified that the sale did not influence his real market value conclusion.

Gibson testified that he discussed the subject property sale with Bob Nelson (Nelson), "SVP of Special Credits" for the bank. (*See* Def's Ex A at 6.) The bank assigned the subject property to Nelson in the spring of 2014. (*Id.*) He "obtained two appraisals: Market Value Appraisal of $1,750,000 for a 12-18 month timeline[; and] Disposition Value Appraisal of $1,250,000 for a 'Quick Sale' of 3 to 6 months." (*Id.*) Gibson testified that, according to Nelson, the bank ultimately decided to sell the subject property to Plaintiffs due to the carrying costs. (*See id.*) He testified that the sale was a distressed sale that involved compulsion; the bank did not want to pay the carrying costs any longer. (*See id.*) Gibson testified that he was not aware of any deadline by which the bank had to sell the subject property, nor was he aware of any offers better than the $1,185,000 offered by Plaintiffs.

C.      *Plaintiffs' Appraisal*

Dowley's appraisal report was prepared on May 1, 2015, with an effective date of April 21, 2015. (Ptfs' Ex 1 at 6.) Dowley testified that he did not consider the income approach to be appropriate in this case, so he developed only the cost and sales comparison approaches. (*See* Ptfs' Ex 1 at 2-3.) He testified that he placed no weight on his conclusion under the cost approach, which was $2,720,190. (*Id.*) Dowley concluded a real market value of $1,285,000 under the sales comparison approach, which was also his reconciled value opinion. (*Id.* at 2.)

_____

[2] MLS reported closing on June 4, 2015, but Gibson testified it was May 29, 2014. (*See* Def's Ex A at 6.)

1. *Plaintiffs' sales comparison approach – comparable sales*

Dowley first researched sales in Astoria and then expanded his search to include Clatsop and Tillamook counties. (*See* Ptfs' Ex 1 at 8.) He testified that there are limited homes in the subject property's price and size range in Astoria. Dowley testified that he did not include beachfront or oceanfront properties because he considered those properties to be in a distinct market for secondary vacation homes, whereas the subject property is a primary residence. He identified four comparable sales and two comparable listings. (*See id.* at 2, 7-8.)

Dowley's sale 1, for $1,100,000 in August 2014, was located 0.06 miles from the subject property. (Ptfs' Ex 1 at 2.) He described it as 3,354 square feet of gross living area on an 11,761-square foot lot. (*Id.*) Dowley made upward adjustments for the gross living area, for the basement and finished rooms below grade, for the garage, and for the lack of an additional amenity such as a swimming pool. (*Id.*) His gross adjustments were 35.1 percent of the sale price. (*Id.*) Dowley concluded an indicated real market value of $1,285,600. (*Id.*)

Dowley's sale 2, for $1,423,000 in March 2014, was located 21.66 miles away from the subject property in Cannon Beach. (Ptfs' Ex 1 at 2.) He described it as 4,591 square feet of gross living area on a 2.01-acre lot. (*Id.*) Dowley made a downward adjustment for the lot and upward adjustments for the basement and finished rooms below grade and for the garage. (*Id.*) His gross adjustments were 14.8 percent of the sale price. (*Id.*) Dowley concluded an indicated real market value of $1,333,000. (*Id.*)

Dowley's sale 3, for $1,185,000 in July 2014, was located 9.94 miles away from the subject property in Gearhart. (Ptfs' Ex 1 at 2.) He described it as 4,148 square feet of gross living area on a 1.01-acre lot. (*Id.*) Dowley made upward adjustments for the gross living area, for the basement and finished rooms below grade, for the garage, and for the lack of an

additional amenity. (*Id.*) His gross adjustments were 21.0 percent of the sale price. (*Id.*) Dowley concluded an indicated real market value of $1,234,200. (*Id.*)

Dowley's sale 4, for $1,000,000 in August 2014, was located 12.22 miles away from the subject property in Gearhart. (Ptfs' Ex 1 at 7.) He described it as 4,264 square feet of gross living area on a 1.51-acre lot. (*Id.*) Dowley made a downward adjustment for location and upwards adjustment for the view, for the construction quality, for the condition, for the gross living area, for the basement and finished rooms below grade, for the garage, and for the lack of an additional amenity. (*Id.*) His gross adjustments were 43.7 percent of the sale price. (*Id.*) Dowley concluded an indicated real market value of $1,286,700. (*Id.*)

Dowley's two listings were each located approximately 20 miles from the subject property in Cannon Beach and Seaside, respectively. (Ptfs' Ex 1 at 7.) Listing 5, for $1,235,000, included 4,614 square feet of gross living area on a 7.12-acre lot. (*Id.*) Listing 6, for $1,299,999, included 6,376 square feet of gross living area on a 12.00-acre lot. (*Id.*)

2.      *Plaintiffs' sales comparison approach – adjustments and reconciliation*

Dowley "had to use sales that [were] over six months old," but found no time adjustment was necessary due to stable market conditions. (Ptfs' Ex 1 at 8.) He wrote that the subject property "is a much larger than typical home[,]" but he found that a market existed for larger homes, as indicated by the comparable sales. (*Id.*) Dowley found "no impact on marketability" for gross living area that exceeded 4,500 square feet so he "adjusted [gross living area] at $100 per square foot up to 4,500 [square feet] and areas above that [were] given no value." (*Id.*) He made "an across the board adjustment" of $50,000 for the subject property's finished basement. (*See id.* at 2, 7, 8.) Dowley treated "the mother in law space, the unfinished basement[,] and the

/ / /

pool space as a separate line item." (*Id.* at 8.) He made "a flat $100,000 adjustment" downward due to the fact that the subject property was not complete. (*See id.* at 2, 8.)

Dowley testified that sale 1 was probably his best comparable sale given its location near the subject property. (*See* Ptfs' Ex 1 at 2.) He testified that sale 2 was another good quality house with good views similar to the subject property. (*See id.*) Dowley testified that sale 3 was located in the gated Pinehurst community and located 10 minutes walking to the beach. (*See id.*) He thought it had a similar overall appeal as the subject property and was a viable comparable. Dowley testified that sale 4 was a bayfront property in Gearhart. (*See id.* at 7.) He testified that it was lower cost construction than the subject property and of an inferior condition. (*See id.*)

In reconciling his comparable sales, Dowley assigned the most weight – 35 percent – to sales 2 and 3, which required "the least adjustments[.]" (Ptfs' Ex 1 at 2.) He assigned 20 percent weight to sale one, which required "larger adjustments[.]" (*Id.*) Dowley gave "a contributory value" of 10 percent to sale 4 due to its "very large adjustments[.]" (*Id.*) He gave no weight to the listings. (*Id.*) Dowley concluded a real market value of $1,285,000. (*Id.*)

Gibson testified that he agreed with Dowley that not many properties in Astoria exceed 4,500 square feet, but he disagreed that it was a "magic number" beyond which the market does not assign value. He testified that Dowley failed to account for the subject property's unfinished basement space and other amenities, such as the elevator.

D.    *Defendant's Appraisal*

Gibson testified that he agreed with Dowley that the income approach was not relevant to the valuation of the subject property. Gibson testified that he performed the cost approach, starting with the 2005 cost factors provided by the Department of Revenue and applying local cost modifiers. (*See* Def's Ex A at 28.) His report did not identify the cost factors or modifiers

that he used.[3] (*See id.*)  After applying adjustments for several forms of depreciation, Gibson concluded a real market value of $1,563,260 under the cost approach.  (*See id.*)  Gibson also performed a sales comparison approach, yielding a real market value range of $1,519,085 to $1,731,679.  (*Id.* at 29.)  That analysis is discussed in more detail below.

      1.    *Defendant's sales comparison approach – comparable sales*

Gibson provided four comparable sales for the subject property.  (Def's Ex B.)  His sales 1 and 2 were the same as Dowley's sales 1 and 2.  Gibson's description of sale 1 was similar to Dowley's, although he made different adjustments, arriving at an adjusted real market value of $1,581,205.  (*Id.*)  Gibson described sale 2 as having 6,028 square feet, which is more than Dowley reported.[4] (*See id.*)  Gibson's square footage total includes 2,129 on the first floor; 1,712 on the second floor; and 2,187 of finished space above the garage.  (*See id.*)  He concluded an adjusted sale price of $1,561,129 for sale 2.  (*See id.*)

Gibson's sale 3, for $1,712,500 in January 2013, was located in Gearhart.  (Def's Ex B.) He described it as a 5,064-square foot house on a 0.26-acre lot.  (*Id.*)  It was built in 1912 with an effective year of 1970.  (*Id.*)  Gibson testified that sale 3 had been redone and its condition was "excellent."  (*Id.*)  He testified that sale 3 was oceanfront.  (*See* Def's Ex A at 36-37.)  Gibson made adjustments and concluded an adjusted sale price of $1,519,085 for sale 3.  (Def's Ex B.)

Gibson's sale 4, for $3,750,000 in June 2012, was located in Cannon Beach.  (Def's Ex B.)  He described it as a 5,281-square foot house on a 1.37-acre lot.  (*Id.*)  It was built in 2005. (*Id.*)  Gibson described its condition as "average."  (*Id.*)  He testified that sale 4 was also

/ / /

---

[3] However, Gibson testified that he emailed "CAAP" (the "computer assisted appraisal program") to Plaintiffs prior to trial.  (*See* Def's Ex A at 28.)

[4] Dowley described sale 2 as having 4,591 square feet of gross living area.  (Ptfs' Ex 1 at 2.)

oceanfront. (*See* Def's Ex A at 36-37.) Gibson described its view as "excellent." (Def's Ex B.) He made adjustments and concluded an adjusted sale price of $1,731,679 for sale 4. (*Id.*)

2. *Defendant's sales comparison approach – adjustments*

Gibson testified that he made adjustments to his sales using depreciated costs from the 2005 cost factor book. He testified that technique was supported by *The Appraisal of Real Estate*. (*See* Def's Ex A at 29.) Gibson testified that, first, he subtracted personal property from each sale; next, he made market based adjustments for time; and, finally, he made adjustments for location, land size, view, and other physical characteristics of the properties. Gibson made downward adjustments in excess of $100,000 to each of his of his sales due to the fact that the subject property was 94 percent complete. (Def's Ex B.) He made a downward "local market adjustment" ranging from $138,283 to $690,434 to his sales 2, 3, and 4. (*Id.*) Gibson testified that the adjustment was, essentially, a location adjustment recognizing that oceanfront locations are more popular than Astoria. He made an additional downward "economic adjustment" ranging from $175,689 to $269,124 to each sale. (*Id.*) Gibson testified that adjustment was because the subject property suffers from economic obsolescence, noting that its basement is larger than any of the comparable sales. He made downward adjustments of $826,294 and $1,260,157, respectively, to sales 3 and 4 because each was oceanfront. (*Id.*)

Gibson's net adjustments to his comparable sales – not including the "local market adjustment," the percentage complete adjustment, and the economic adjustment – ranged from 7.3 for sale 3 to 70.7 percent for sale 1, as a percentage of sale price. (*See* Def's Ex B.) His gross adjustments ranged from 53.0 percent for sale 4 to 105.3 percent for sale 3. (*See id.*)

Gibson testified that sale 1, with an adjusted price of $1,581,205, was his best value indication under the sales comparison approach. (Def's Ex A at 40.) He testified that it was

built around the same time as the subject property, had a similar location and view as the subject property, and sold within four months of the valuation date. (*See id.*) Gibson concluded a real market value of $1,581,205 under the sales comparison approach. (*Id.*)

3.    *Defendant's reconciliation and value conclusion*

In reconciling the two approaches to value that he considered, Gibson placed more weight on his "market related cost approach." (*See* Def's Ex A at 40.) He concluded a reconciled real market value of $1,563,260, which was his value conclusion under the market related cost approach. (*See id.*) Gibson testified that he would not have selected a real market value under the market related cost approach if it had not been supported by the sales comparison approach. He testified that, if the sales comparison approach had revealed that the value under the market related cost approach was wrong, then he would have examined the problem and reconsidered his value conclusion.

## II. ANALYSIS

The issue before the court is the real market value of the subject property for the 2015-16 tax year. ORS 308.205(1) defines real market value:[5]

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

The assessment date for the 2015-16 tax year was January 1, 2015. *See* ORS 308.007; 308.210.

There are three approaches to value that must be considered to determine the real market value of real property: the sales comparison approach, the cost approach, and the income approach. *See* OAR 150-308.205-(A). In a particular case, all three approaches may not be applicable; however, each approach "must be investigated for its merit." *Id.* Whether any one

---

[5] The court's references to the Oregon Revised Statutes (ORS) are to 2013.

approach is more persuasive in a given case "is a question of fact to be determined by the court" based on the record before it. *Pacific Power & Light Co. v. Dept. of Rev.*, 286 Or 529, 533, 596 P2d 912 (1979). In addition to the three approaches to value, a recent sale of the subject property "is important in determining its market value. If the sale is a recent, voluntary, arm's[-] length transaction between a buyer and seller, both of whom are knowledgeable and willing, then the sales price, while certainly not conclusive, is very persuasive of the market value." *Kem v. Dept. of Rev.*, 267 Or 111, 114, 514 P2d 1335 (1973).

The parties agree that 2015-16 tax roll real market value of $1,999,234 for the subject property is in error. (*See* Compl at 2.) Plaintiffs request that the 2015-16 real market value be reduced to $1,180,000, their purchase price, although their appraiser Dowley concluded a real market value of $1,285,000. Defendant requests that the 2015-16 real market value of $1,563,260 determined by the board of property tax appeals be sustained. (*See id.*)

Plaintiffs bear the burden of proving their case by a preponderance of the evidence. *See* ORS 305.427. "Preponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Rev.*, 4 OTR 302, 312 (1971). To meet their burden, Plaintiffs must "provide competent evidence of the [real market value] of their property." *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002). Competent evidence of real market value "includes appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents, and licensed brokers." *Danielson v. Multnomah County Assessor*, TC-MD 110300D, WL 879285 (Or Tax M Div Mar 13, 2012).

/ / /

/ / /

A.    *The Sale of the Subject Property*

Under *Kem*, a recent, voluntary, arm's-length sale of the subject property provides persuasive evidence of its real market value. 267 Or at 114. Here, the sale of the subject property to Plaintiffs was following foreclosure by the bank. "There are many practical reasons why the sale of a property following foreclosure by the lender might involve an atypical market condition rendering the transaction of little or no value as an indication of market value." *Kryl v. Lane County Assessor*, TC-MD 100192B, WL 1197444 at *2 (Or Tax M Div Mar 30, 2011). For example, "the lender may have a policy of selling such property only for the amount of the underlying debt, regardless of what the property may actually be worth." *Id*. "This court has been reluctant to consider 'foreclosure' sales as 'arm's[-]length transactions' because such sales 'may well involve an element of compulsion on the part of the seller.'" *Voronaeff v. Crook County Assessor*, TC-MD 110361C, WL 1426847 at *4 (Or Tax M Div Apr 25, 2012) (citations omitted). A foreclosure sale does not represent a voluntary transaction between a buyer and seller. The seller of the property might be compelled to sell the property at a lower value in order to settle the debt of the property. Therefore, a foreclosure sale is typically not considered a voluntary, arm's-length transaction under ORS 308.205.

Neither Dowley nor Gibson concluded that the subject property's sale price was its real market value; each noted that the bank was motivated to recoup its costs and each concluded a real market value in excess of the sale price. Gibson spoke with a representative of the bank who told him that the bank was motivated to sell because it no longer wanted to pay the carrying costs associated with the subject property. A few aspects of the subject property sale indicate that it might, nevertheless, represent real market value. Specifically, the subject property was exposed to the market for approximately two years and there is no evidence that the bank received a

better offer than Plaintiffs'. However, as Gibson noted, for the first year the subject property was listed at $2.4 million, a price in excess of any value opinion for the subject property. Thus, although the subject property was on the market for approximately two years, the first year may have represented an excessive listing price. As reported by Gibson, the bank's appraiser concluded a reasonable marketing time of 12-18 months for the subject property. Ultimately, the court is not persuaded that the subject property's sale price was its real market value.

B.    *Sales Comparison Approach*

Both appraisers used the sales comparison approach to value the subject property. The sales comparison approach "may be used to value improved properties, vacant land, or land being considered as though vacant." *Chambers Management v. Lane County Assessor*, TC-MD 060354D, WL 1068455 at *3 (Or Tax M Div Apr 3, 2007) (citations omitted). Under the sales comparison approach, "only actual market transactions of property comparable to the subject property, or adjusted to be comparable," may be used and all sales "must be verified to ensure they reflect arm's-length market transactions." OAR 150-308.205-(A)(2)(c). To be comparable, properties should be "similar in size, quality, age and location" to the subject property. *Richardson v. Clackamas County Assessor*, TC-MD 020869D, WL 21263620 at *3 (Or Tax M Div Mar 26, 2003).

Dowley relied upon four comparable sales and considered two comparable listings, although he gave no weight to the listings. Two of the comparable sales that Dowley relied upon were also used by Gibson. None of the comparable sales identified by either appraiser was as large as the subject property, which included 7,971 square feet of gross living area according to Dowley. Gibson concluded that the subject property was 15,843 square feet, including 4,902 square feet of unfinished basement space. By contrast, the comparable sales and listings

identified by Dowley and Gibson ranged in size from 3,354 to 6,376 square feet. Both appraisers characterized the subject property as an overimprovement with respect to its size and amenities.

A property that has "too many expensive amenities for its location (known as an *overimprovement*) is out of balance." Appraisal Institute, *The Appraisal of Real Estate* 379 (14th ed 2014); *see also Chilton v. Multnomah County Assessor*, TC-MD 060604C, WL 824149 at *5 (Or Tax M Div Mar 13, 2007) (observing that the value of the taxpayer's house was "at the high end of the range and [was], perhaps, an overimprovement for the neighborhood"). Overimprovements "can lead to functional obsolescence that may need to be accounted for in sales comparison, income capitalization, and cost approach analyses, but differently in each approach." *The Appraisal of Real Estate* at 379.

Dowley sought to account for the subject property's excessive size compared to other properties in its market by capping his adjustment for gross living area at 4,500 square feet. In other words, Dowley adjusted his comparable sales for differences in gross living area up to 4,500 square feet, but not beyond. Gibson also made a downward "economic adjustment" to each of his comparable sales. His economic adjustment was a percentage of the adjusted sales price.

The court agrees with the two appraisers that the subject property is an overimprovement for its market. That finding is supported by the lack of comparable sales as large as or larger than the subject property. The largest house identified by either appraiser was Dowley's listing of 6,376-square foot house. As between the two appraisers' adjustment methods, the court finds Dowley's approach more persuasive because it bears a direct relationship to the aspect of the subject property that is overimproved – namely, its size. Although the court agrees with Dowley's insight that the market ascribes diminishing value to more gross living area beyond a

certain point, the court is not persuaded that that point is 4,500 square feet. The comparable sales and listings identified by the appraisers demonstrate that the subject property's market includes properties at least up to 6,300 square feet. Dowley did not provide sufficient evidence or analysis to support a conclusion that a 6,300-square foot property does not sell for more than a 4,500-square foot property, all other aspects being equal. As a result, the court concludes that Dowley's real market value conclusion is understated by approximately $180,000.[6] Adding that amount to Dowley's conclusion of $1,285,000 yields a real market value of $1,465,000.

Gibson concluded that the subject property's real market value was $1,563,260. He adjusted his sales using depreciated cost factors from the Department of Revenue's 2005 cost factor book. As Gibson noted, that method is described by *The Appraisal of Real Estate* as an acceptable technique to make quantitative adjustments. *See id.* at 398, 401. The court's concern with Gibson's appraisal is not his method for making adjustments, but rather, the magnitude of his adjustments. Gibson calculated his net adjustment to each sale. However, "[t]he magnitude of net adjustments is often a less reliable indicator of accuracy" than gross adjustments. *Id.* at 394. "A net adjustment figure may be misleading because the appraiser cannot assume that any inaccuracies in the positive and negative adjustments will cancel each other out." *Id.* Although Gibson's net adjustments ranged from 7.3 to 70.7 percent, his gross adjustments ranged from 53 to 105.3 percent.[7] Those adjustments are significant and call into question either the accuracy of the adjusted sale prices or the comparability of the properties selected.

The court finds that Dowley presented a more persuasive sales comparison approach analysis. However, his ultimate value conclusion was understated as a result of his decision not

___

[6] That is the difference between 4,500 square feet and 6,300 square feet, 1,800 square feet, multiplied by $100 per square foot, the adjustment that Dowley used for gross living area.

[7] By contrast, Dowley's gross adjustments to his comparable sales ranged from 14.8 to 43.7 percent.

to adjust for gross living area differences beyond 4,500 square feet. The court finds that a real market value of $1,465,000 is supported under the sales comparison approach.

C.      *Other Approaches to Value*

Neither appraiser used the income approach to value because the subject property is not an income-producing property. Dowley used the cost approach, but gave his value conclusion under that approach no weight. He wrote that the "much higher value" of $2,720,190 indicated by the cost approach confirmed that the subject property "is an over improvement." (Ptfs' Ex 1 at 2-3.) Gibson also used the cost approach, finding an indicated value of $1,563,260, but he did not identify any of the specific cost factors or adjustments that he used to reach his value conclusion. Plaintiffs objected to Gibson's cost approach on that basis. Absent more supporting detail, the court is unable to give any weight to Gibson's cost approach value conclusion.

III.  CONCLUSION

After careful consideration, the court finds the sales comparison approach provided the most persuasive evidence of the subject property's real market value as of January 1, 2015. The court further finds that Plaintiffs' appraiser provided the more persuasive analysis under the sales comparison approach. However, Plaintiffs' appraiser did not adequately adjust for the size of the subject property as compared with his comparable properties. The court finds that his real market value conclusion was understated by $180,000 and finds that the subject property's real market value was $1,465,000 as of January 1, 2015. Now, therefore,

/ / /

/ / /

/ / /

/ / /

IT IS THE DECISION OF THIS COURT that the 2015-16 real market value of property identified as Account 22265 was $1,465,000.

Dated this ____ day of April 2017.

_____
ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed. TCR-MD 19 B.*

*This document was filed and entered on April 28, 2017.*